UNITED STATES of America, Appellee,

v.

Luis EDWARDO–FRANCO, Rocio Gallego, a/k/a "Mariela Florez", Jorge Lopez and Sergio Castro–Munoz, Defendants–Appellants.

Nos. 793, 776, 1383 and 1342, Dockets 88–1395, 88–1412, 88–1468 and 88–1469.

United States Court of Appeals, Second Circuit.

Argued June 15, 1989.

Decided Aug. 29, 1989.

---

Colleen P. Cassidy, The Legal Aid Society, Federal Defender Services Appeals Unit, New York City, for defendant-appellant Edwardo–Franco.

John M. Apicella, Brooklyn, N.Y., for defendant-appellant Gallego.

Susan G. Kellman, New York City, for defendant-appellant Lopez.

Thomas L. Ferro, Ridgewood, N.J. (Ferro and Ferro, Ridgewood, N.J., of counsel), for defendant-appellant Castro–Munoz.

Emily Berger, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., and John Gleeson, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Before OAKES, Chief Judge, VAN GRAAFEILAND and PRATT, Circuit Judges:

VAN GRAAFEILAND, Circuit Judge:

Following a jury trial in the United States District Court for the Eastern District of New York, Luis Edwardo–Franco, Rocio Gallego, Jorge Lopez and Sergio Castro–Munoz were convicted of conspiracy to possess cocaine with intent to distribute and possession with intent to distribute. Castro–Munoz also was convicted of using and carrying a firearm during and in relation to a drug-related crime. For the reasons that follow, we vacate all convictions. We remand for a new trial against Edwardo–Franco, Gallego and Lopez; we direct that the charges against Castro–Munoz be dismissed.

Around the middle of July 1987, the New York Drug Task Force, a joint drug enforcement effort of federal, state and city police, began surveillance of a rented house on Birchwood Park Drive in Jericho, New York. The record does not disclose who the record tenant was or who was occupying the house at that time. Edwardo–Franco, Gallego and Castro–Munoz moved into the house on July 23, 1987 under circumstances to be discussed hereafter.

The Government introduced evidence that on August 4, 1987, Gallego brought a gray plastic bag from the house and put it in the back seat of a car, following which Gallego and Edwardo–Franco left in the car with Edwardo–Franco driving. Agents followed the car which made three stops. During the first stop, Gallego remained in the car while Edwardo–Franco made a pay station telephone call. During the second stop, Edwardo–Franco remained in the car while Gallego went in the direction of a telephone booth. While she was gone, Lopez got into the back seat of the car. When the car stopped for a third time on West 161st Street in Manhattan, Lopez left the car carrying the gray plastic bag and entered a nine-story residential building. Agents followed Lopez into the building and, after stopping him, discovered that the bag contained a kilogram of cocaine.

Other agents, who were informed by radio of Lopez's arrest, stopped and arrested Edwardo–Franco and Gallego. Agents then obtained a warrant to search the Birchwood Park Drive house. In the course of the search, they found fifteen kilograms of cocaine in a basement room closet, a number of weapons, and several incriminating notebooks and documents. They also met and arrested Castro–Munoz who was living in the house.

The four defendants, all natives of Colombia, were convicted under Count One of the indictment of conspiracy to possess

with intent to distribute the fifteen kilograms of cocaine found in the basement. (21 U.S.C. § 841(b)(1)(A)(ii)(II) and 21 U.S.C. § 846). Edwardo–Franco, Gallego and Castro–Munoz were convicted under Count Two of knowingly and intentionally possessing with intent to distribute these same drugs. (21 U.S.C. § 841(b)(1)(A)(ii)(II)). All four defendants were convicted under Count Three of knowingly and intentionally possessing with intent to distribute the kilogram of cocaine taken from Lopez. (21 U.S.C. § 841(b)(1)(B)(ii)(II)). Castro–Munoz was convicted under Count Four of knowingly using and carrying firearms during and in relation to a drug trafficking crime. (18 U.S.C. § 924(c)(1) and (c)(2)).

Edwardo–Franco and Gallego appeared before the district court at the same time for sentencing. In his allocution on their behalf, their counsel argued that they presented no danger to the community and in any event would be deported to Colombia at the end of their prison term. The district court then made the following remarks about Colombians:

> They don't have too much regard for Judges. They only killed 32 Chief Judges in that nation. Their regard for the judicial system, the men who run their laws, I'm glad I'm in America. That's why I pledge allegiance to the flag. My mother and father came from Italy.

Colloquy between court and counsel then continued as follows:

> Your Honor, I've got these people, I have seen them numerous times. They are not of the type of people, I don't feel, would go out and rob a 7–11 or do anything illegal, truly. Most of the people that come to this country are in it as immigrants, suffer a tremendous pressure moneywise, et cetera.
>
> THE COURT: Then they should have stayed where they were. Nobody told them to come here. I'm one of the fellows who makes United States citizens. Nobody tells them to come and get involved in cocaine. Don't give me that theory. My father came over with $3 in his pocket. He has a Federal Judge as a son.
>
> That's nonsense. Do they have anything to say?

Speaking on her behalf, Gallego had only the following to say:

> I ask for pardon for whatever error I committed. I ask, request that the sentencing be done, as for my person, not for my nationality. I have and I ask you for leniency. I spent five months and my life has been very, very harsh indeed.

The district court then sentenced both of these first time offenders to concurrent twenty-year terms on Counts One and Two and a consecutive ten-year term on Count Three for a total of thirty years imprisonment, to be followed by a lifetime special parole term of supervised release.

The Supreme Court and Courts of Appeals, including this Court, have emphasized repeatedly that not only must justice be done, it also must appear to be done. In the oft-quoted statement of Justice Frankfurter, "justice must satisfy the appearance of justice." *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954). *See also Liljeberg v. Health Services Acquisition Corp.,* —— U.S. ——, 108 S.Ct. 2194, 2204, 100 L.Ed.2d 855 (1988); *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 242–43, 100 S.Ct. 1610, 1613, 64 L.Ed.2d 182 (1980); *Mayberry v. Pennsylvania,* 400 U.S. 455, 465, 91 S.Ct. 499, 504–05, 27 L.Ed.2d 532 (1971); *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955); *United States v. Diaz,* 797 F.2d 99, 100 (2d Cir.1986), *cert. denied,* —— U.S. ——, 109 S.Ct. 57, 102 L.Ed.2d 35 (1988). In recent years, these same Courts have adhered steadfastly to the proposition that race and nationality should play no adverse role in the administration of justice. *See, e.g., Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Turner v. Murray,* 476 U.S. 28, 35–38, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986); *Rose v. Clark,* 478 U.S. 570, 587, 106 S.Ct. 3101, 3110, 92 L.Ed.2d 460 (1986) (Stevens, J., concurring); *Roman v. Abrams,* 822 F.2d 214, 227–28 (2d Cir.1987), *cert. denied,* —— U.S. ——, 109 S.Ct. 1311, 103 L.Ed.2d 580 (1989).

■ We believe that Gallego's plaintive request that she be sentenced "as for my person, not for my nationality", mirrors what would be the objective reaction of anyone familiar with the above-quoted comments of the district court, namely that ethnic prejudice somehow had infected the judicial process in the instant case. Our

conclusion in this regard should not be interpreted to mean that the district judge in fact was guilty of such prejudice; it means that he appeared to be. In short, the district court's conduct did not "satisfy the appearance of justice."

It follows that the severe sentences meted out to Edwardo–Franco and Gallego cannot stand. Moreover, the district court's comments infected the sentences given Lopez and Castro–Munoz, who also were Colombians. Lopez was sentenced to two concurrent fifteen-year terms to be followed by a lifetime term of special release and Castro–Munoz was sentenced to three concurrent fifteen-year terms on the drug charges, a five-year consecutive sentence on the firearms charge, and a lifetime term of supervised release. These men also were first time offenders.

At first blush, it would appear that a simple remand for resentencing would be a sufficient remedy for the district court's unfortunate choice of language. However, appellants contend that they were treated unfairly throughout the trial. Ordinarily, rulings by a trial court that are not prohibited by statute or the Constitution are weighed under an abuse of discretion standard. *See, e.g., Hamling v. United States,* 418 U.S. 87, 124–25, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974); *United States v. Wilson,* 750 F.2d 7, 9 (2d Cir.1984), *cert. denied,* 479 U.S. 839, 107 S.Ct. 143, 93 L.Ed.2d 85 (1986); *United States v. Albergo,* 539 F.2d 860, 863 (2d Cir.), *cert. denied,* 429 U.S. 1000, 97 S.Ct. 529, 50 L.Ed.2d 611 (1976). A party does not demonstrate judicial bias simply by showing that a majority of the trial judge's rulings were against him and that there were occasional flare-ups between his attorney and the court. *In re International Business Machines Corp.,* 618 F.2d 923, 927–32 (2d Cir.1980). However, where, as here, there is an indication of extra-judicial bias, each questionable adverse ruling by the trial judge tends to magnify the appearance of injustice. As discussed in the paragraphs that follow, there were a number of such rulings in the instant case.

### EDWARDO–FRANCO and GALLEGO

At the time of trial, Edwardo–Franco and Gallego had been residents of the United States for only two years. Because neither of them was conversant in English, they were questioned and spoke through a Spanish interpreter. Indeed, their only means of communication with their own attorney was through an interpreter. Perhaps, because they lived together in a common-law relationship, they retained the same lawyer to represent them. Upon learning of this, the district court was required to "promptly inquire with respect to such joint representation and [to] personally advise each defendant of the right to the effective assistance of counsel, including separate representation." Fed.R.Crim.P. 44(c). In *United States v. Curcio,* 680 F.2d 881, 888–91 (2d Cir.1982), we suggested the form that the district court's inquiries should take, and we summarized those suggestions in *United States v. Iorizzo,* 786 F.2d 52, 59 (2d Cir.1986), as follows:

> [T]he trial court should: (i) advise the defendant of the dangers arising from the particular conflict; (ii) determine through questions that are likely to be answered in narrative form whether the defendant understands those risks and freely chooses to run them; and (iii) give the defendant time to digest and contemplate the risks after encouraging him or her to seek advice from independent counsel.

Where there is a language problem, as in the instant case, it is particularly important that procedures such as these be followed. Edwardo–Franco and Gallego contend correctly that they were not. The district court did not explain the ramifications of potential conflict in adequate detail. The district court did not elicit defendants' understanding of their waiver of rights by way of narrative answers but by simple one-word responses made through an interpreter. The district court sought and secured an immediate decision from the defendants as to whether they wished to continue with one lawyer, instead of giving them time to reflect on the matter and encouraging them to seek advice from independent counsel.

Over a month prior to the time the district court made its inadequate inquiry concerning waiver of joint representation, the AUSA wrote the district court expressing her concern that the interests of Edwardo–Franco and Gallego "may diverge in virtually every stage of the proceeding" and urging the court to utilize the procedures outlined in *Iorizzo, supra,* to determine

whether they made a knowing and intelligent waiver of their right to decline dual representation. During the course of the abbreviated colloquy between defendants and the court, the AUSA also suggested unsuccessfully that the district court adhere more closely to the procedures outlined in *Curcio, supra.* The suggestions of the AUSA should have been followed. They were not. Accordingly, we hold that Edwardo–Franco and Gallego did not knowingly and willingly waive their right to be represented by separate counsel having no conflict of interest. *See Colon v. Fogg,* 603 F.2d 403, 406–08 (2d Cir.1979).

Of course, this fact, standing alone, does not automatically entitle these two defendants to a new trial. To justify a retrial, there must be a showing of some specific prejudice resulting from the joint representation. *United States v. Carrigan,* 543 F.2d 1053, 1055–57 (2d Cir.1976). The absence of proper inquiry on the issue of waiver did, however, shift from the defendants to the Government the burden of proof on the issue of prejudice. *Id.* at 1056; *see Holloway v. Arkansas,* 435 U.S. 475, 495, 98 S.Ct. 1173, 1184, 55 L.Ed.2d 426 (1978) (Powell, J., dissenting).

It is a close question whether the Government has sustained its burden of proving that neither Edwardo–Franco nor Gallego was prejudiced by the joint representation. It is quite obvious that their joint counsel took a sink-or-swim-together approach on behalf of his two clients. In her summation, the AUSA said that Gallego "doesn't say very much about what happened on August 4th, except to corroborate, almost word for word, what her husband said. It was like reading from a transcript." Had Gallego been represented by separate counsel, it is doubtful that this damaging comment could have been made. In his summation, counsel for Edwardo–Franco and Gallego referred to them collectively approximately sixty-seven times. He referred to Gallego alone approximately nine times and to Edwardo–Franco alone approximately thirteen times. It was only in his sentencing allocution that defense counsel attempted to draw any distinction between his clients. Referring to Gallego, he said, "if anyone deserves anything, as far as consideration from the Court, it would be her, more than anybody else in

this case. Love is a continuing thing. If your husband is involved in something, you either have a choice of running away, deserting your husband and starting life anew or perhaps putting up with something that's going on." *Cf. Mone v. Robinson,* 430 F.Supp. 481, 485–86 (D.Conn.), *aff'd,* 573 F.2d 1293 (2d Cir.1977). Had Gallego been represented by separate counsel, it is reasonable to expect that the substance of this argument would have been made to the jury. *See Herring v. New York,* 422 U.S. 853, 858–64, 95 S.Ct. 2550, 2553–56, 45 L.Ed.2d 593 (1975). It was not. *See Wood v. Georgia,* 450 U.S. 261, 271–73, 101 S.Ct. 1097, 1103–04, 67 L.Ed.2d 220 (1981). To make matters worse, relations between the district court and counsel for both Edwardo–Franco and Gallego were anything but harmonious, counsel twice being held in contempt of court.

We need not decide whether the above-described sequence of events, standing alone, would warrant a new trial for Edwardo–Franco and Gallego. We conclude, however, that it bears directly on the issue whether Edwardo–Franco and Gallego appear to have had a fair trial.

Other troublesome matters require a brief reference to the defendants' proof. Edwardo–Franco, Gallego and Castro–Munoz testified. Edwardo–Franco said that, after he and Gallego came to the United States in 1985, he worked as a drywall taper and his wife worked as a cleaning woman. They lived for a while in a single small room in Woodside and then in two small apartments in West New York, New Jersey. While living in the second apartment, they met a Colombian friend named Raul Belascasas, and Edwardo–Franco worked on occasion for him. According to Edwardo–Franco, Belascasas offered to rent the master bedroom of the Birchwood Park Drive house to Edwardo–Franco and Gallego for the same rent they were paying in West New York, *i.e.,* $500 a month, and on July 23 they moved to the Birchwood Park Drive house. Because Castro–Munoz, another friend of Edwardo–Franco, had no place to stay, Edwardo–Franco invited him to stay with them. The three of them denied all knowledge of the drugs in the basement closet.

Edwardo–Franco testified that on August 4, 1987, he and Gallego left the house

in the morning, he to give several job estimates and she to do cleaning work. When they returned home, they found a shopping bag in the den with a note from Belascasas asking Edwardo–Franco to deliver the bag to an address in Manhattan. Edwardo–Franco and Gallego already had planned to drive to New Jersey that afternoon to collect a rental security deposit from their former landlady and to drop off a suit for alterations. They also had promised Lopez, with whom Edwardo–Franco played soccer, a ride to New Jersey. Edwardo–Franco put the shopping bag in the car without examining its contents. Gallego brought a dark suit bag from the house and placed that in the car. En route to New York and New Jersey, Edwardo–Franco and Gallego picked up Lopez. When they arrived at 161st Street in Manhattan, Edwardo–Franco asked Lopez to deliver the bag, because Edwardo–Franco didn't want Gallego to leave the car in what was an unsavory neighborhood. It was while Lopez was in the process of making this delivery that he was arrested.

█ This was far from an air-tight defense. However, the defendants were entitled to a fair opportunity to present it. They were hampered in this respect by questionable rulings and comments of the district court. For example, to support Edwardo–Franco's testimony concerning his residence in West New York and his entitlement to the return of the rental deposit, he called his former landlady as a witness. When Edwardo–Franco and Gallego's counsel attempted to question the landlady about their lease and deposit, the AUSA successfully objected on the unique ground that counsel was "using this witness to confirm the defendant's story, *which is totally inappropriate.*" (emphasis supplied). This argument should have been rejected. In view of the Government's strong attack on the credibility of the defendants, the testimony of their former landlady was admissible to strengthen the probability that they were telling the truth about their automobile trip on August 4, 1987. *See Hasselstrom v. McKusick,* 324 F.2d 1013, 1018 & n. 7 (C.C.P.A. 1963); *see also United States v. Eliano,* 522 F.2d 201, 202 (2d Cir.1975); *United States v. McIntire,* 461 F.2d 1092 (5th Cir. 1972); *United States v. Howell,* 447 F.2d

1114, 1118 (2d Cir.1971); *United States v. Del Purgatorio,* 411 F.2d 84, 86 (2d Cir. 1969). The Government now argues that, "[t]he testimony was precluded not because Edwardo–Franco testified first and the court would not permit corroboration, as Florez would have the Court believe (Florez's Brief at 34), but because Edwardo–Franco's evidence showed that Dominguez's would be irrelevant." (Government's Brief at 55). It would be strange indeed if, while writing on the issue of unfairness in the district court, we accepted this argument by the Government as factually correct. The district court sustained the AUSA's objection on precisely the ground advanced by the AUSA, saying of Edwardo–Franco's former landlady, "She can't be a corroborative witness. She cannot be."

When defense counsel grimaced at the district court's unusual ruling, he was held in contempt of court. Although the district court excused the jury before this holding was made, the jury would have been most obtuse if it did not realize what was taking place:

THE COURT: I don't think you learned your lesson, Mr. Counselor ...

Step out, please. I know how to handle this all by myself. I don't need help from the jury.

█ The district court precluded Edwardo–Franco from testifying about what the Government describes as "irrelevant details", *i.e.,* "background information about his employment, former residences and jobs." This evidence was relevant. Big-time drug dealers ordinarily do not live in one-room apartments and do cleaning and drywall taping for a living. The Government also argues that the district court correctly sustained its objection to Edwardo–Franco's testimony about the inducements offered him by Belascasas to move into the Birchwood Park Drive house, on the ground that this evidence was hearsay. The evidence went solely to Edwardo–Franco's state of mind; it was not hearsay. Moreover, despite the district court's comments to the contrary, it was "material". There is a puzzling gap in the Government's proof concerning the Birchwood Park Drive house. The Government proved that it was rented but did not identify the tenant. Defendants testified that

Belascasas was the tenant. The Government argued in summation that "Mr. Belascasas is a figment of these defendants' imagination. And every defendant who testified about Belascasas was making that story up." Assuming that this argument was not one of questionable propriety, *see United States v. Modica*, 663 F.2d 1173, 1178–79 (2d Cir.1981), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982), the very fact that it was made emphasizes the importance of the role allegedly played by Belascasas in this entire matter. Someone invited or permitted Edwardo–Franco and Gallego to live in the Birchwood Park Drive house. If, as the Government "suggests", it wasn't Belascasas, the picture presented to the jury was missing an important piece. Since, for reasons known only to itself, the Government did not prove that someone other than Belascasas was the tenant, it is in a poor position to argue that proof of the invitation extended defendants by Belascasas was not material.

Defendants contended that because the cocaine seized from Lopez was wrapped inside several bags, it would not be visible to one simply looking in the shopping bag which Lopez carried. Although the DEA witnesses concurred, their testimony differed as to how many wrappings concealed the drug's presence. When counsel for Edwardo–Franco and Gallego attempted to clarify exactly how the drug was wrapped, the district court *sua sponte* precluded him from doing so. The announced basis for this peculiar ruling was that, since the shopping bag was taken from Lopez, only his attorney had the right to cross-examine the agents on this point. When counsel for Edwardo–Franco and Gallego asked the court whether this precluded him from conducting an examination on the same point, the court replied:

Yes. On that basis I am precluding you. Absolutely. Without any doubt I am precluding you.

The lawyer thus precluded was the one twice held in contempt by the district court.

■ One of the Government's more important witnesses was a handwriting expert named Peter Tytell. Although defense attorneys learned two weeks prior to trial that the handwriting in some of the seized documents was being subjected to

expert analysis, they did not learn until the opening of trial what the expert had reported, *viz.*, that the handwriting on several of the seized documents matched that of Edwardo–Franco and Gallego and that Castro–Munoz had disguised the handwriting in his exemplar so that no comparison could be made. The timing of this information left something to be desired. *See United States v. Kelly*, 420 F.2d 26, 28–29 (2d Cir.1969). Defense counsels' motion to suppress Tytell's testimony nonetheless was denied on the ground that they had had two weeks notice that the handwriting was being examined and could have secured a handwriting expert of their own during that period.

This ruling was based on a faulty premise. Edwardo–Franco, Gallego and Castro–Munoz all denied under oath that the inculpatory handwriting was theirs. If this testimony was true, they had no reason to anticipate that the Government's expert would testify otherwise. The defendants should not have been expected to hire a handwriting expert of their own until they were informed of the adverse report of the Government's expert.

■ Counsel for Edwardo–Franco and Gallego complains that the district court unfairly limited his cross-examination of Tytell. Of course, the scope of cross-examination is largely within the discretion of the trial court. However, the court must be careful not to give an impression that its rulings are biased in any way or that it is vouching for the credibility or expertise of the witness. When defense counsel asked Tytell if he received several thousand dollars each time he testified for the Government, the court interjected the statement:

This is how he earns his living. What is wrong with that?

The court's stated position was that what Tytell earned in testifying for the Government in prior cases was immaterial:

That doesn't show bias here. Maybe where you come from it shows bias.

The district court may be right in holding that the testimony doesn't show bias; however, it does show a possibility, or perhaps even a probability, of bias. We find substantial merit in Judge Engel's statement

in *United States v. Leja*, 568 F.2d 493, 499 (6th Cir.1977), that evidence of what a witness received from the Government for past services and might therefore expect in the future is "highly relevant to the question of his potential bias and interest."

At another point, when defense counsel attempted to show that two handwriting experts could differ in their opinions, the trial transcript reads as follows:

Q. You can have two experts looking at the same document and you say yes this is him or no this isn't him and the other guy would say the opposite?

A. Up to the person looking at the charts to decide which one of us is right.

Q. If the other person can't afford to—

Ms. HELLER: Objection.

THE COURT: Sustained. Disregard that completely. Not part of this.

I suggest, counsel, you refrain from making what you know are improper statements. If you didn't understand that you've learned it now. You've already been advised of that.

MR. SCREMIN: I apologize.

THE COURT: You ask questions. Don't shake your head because that will get you into real trouble.

MR. SCREMIN: Judge—

THE COURT: Counsel. All right. Don't you shake your head. Please step outside.

Although the district judge subsequently rescinded the two $1,000 fines that he levied on counsel, and we are not in a position to pass upon the propriety of the contempt orders, the fact remains that the judge substantially hampered the impeaching efforts of defense counsel.

██ Edwardo–Franco and Gallego are represented by separate counsel on this appeal, neither of whom was trial counsel. Both argue that the district judge was guilty of bias throughout the trial, and we have not exhausted the instances they cite in support of this contention. Although, as above stated, we are not prepared to hold that the district judge actually was biased, we agree with counsel that he appeared to be. We have emphasized that a trial court "must at all times maintain the appearance of impartiality and detachment", *United States v. Mazzilli*, 848 F.2d 384, 388 (2d Cir.1988); that it "must exercise caution to maintain an appearance of impartiality", *United States v. Victoria*, 837 F.2d 50, 54 (2d Cir.1988). Repeating what we have said, *supra*, that adverse rulings, standing alone, furnish weak support for a claim of bias, we conclude that there were enough questionable rulings and incidents in the instant case to support appellants' claim of apparent bias and unfairness. Accordingly, in the interest of justice, we hold that Edwardo–Franco and Gallego are entitled to a new trial.

## CASTRO–MUNOZ

██ A defendant-appellant, whose claim for reversal is based on alleged insufficiency of the evidence, bears "a very heavy burden." *United States v. Soto*, 716 F.2d 989, 991 (2d Cir.1983). After carefully examining all the evidence submitted to the trial court, we hold that Castro–Munoz has met this burden. He occupied a single room in the Birchwood Park Drive house at the invitation of Edwardo–Franco for twelve days prior to his arrest. He was in his room when the police arrived, and he opened the front door to admit them. He never was seen to perform any act that was illegal or which had an illegal purpose. He made no inculpatory statements to the police. Other than his mere presence in the Birchwood Park Drive house, there was nothing to show that he was in possession of the drugs with intent to distribute them or a party to a conspiracy to possess and distribute. The above-mentioned charges against him therefore must be dismissed. *See United States v. Young*, 745 F.2d 733, 764 (2d Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); *United States v. Gaviria*, 740 F.2d 174, 183–84 (2d Cir.1984); *United States v. Soto, supra*, 716 F.2d at 991–92. Admittedly two pistols were found on the shelves of closets connected to Castro–Munoz's bedroom. However, Castro–Munoz testified that they were there when he arrived at the house, and there was no other evidence to connect him in any way with the guns. Their presence in the closet was not enough to establish an unlawful connection between Castro–Munoz and the drugs in the basement closet or the drugs in the shopping bag seized from Lopez. *United States v. Young, supra*, 745 F.2d at 764.

The Government concedes that, because of this Court's subsequent decision in *United States v. Feliz–Cordero,* 859 F.2d 250 (2d Cir.1988), Castro–Munoz's conviction on the firearm count must be reversed.

### LOPEZ

If, as the indictment alleges, there were one or two conspiracies, it is the Government's contention that Edwardo–Franco and Gallego were the principal members of both conspiracies. Holding, as we do, that these two defendants must be retried because of unfairness in the trial, we find it difficult to hold that the verdict against Lopez was not tainted to some extent by the same unfairness. If, on remand, the jury should accept the testimony of Edwardo–Franco and Gallego that they did not know the shopping bag which Edwardo–Franco asked Lopez to deliver contained cocaine, the jury well might make the same finding with regard to Lopez.

Lopez also argues that, insofar as the conspiracy charges are concerned, he is entitled to the so-called "single transaction" defense. *See United States v. Aviles,* 274 F.2d 179, 189–90 (2d Cir.), *cert. denied,* 362 U.S. 974, 80 S.Ct. 1058, 4 L.Ed.2d 1010 (1960); *United States v. Stromberg,* 268 F.2d 256, 267 (2d Cir.), *cert. denied,* 361 U.S. 863, 80 S.Ct. 124, 4 L.Ed.2d 102 (1959). A determination as to whether the alleged conspiracies existed and whether the single shopping bag delivery by Lopez made him a member of those conspiracies, requires an analysis of both the nature of the alleged enterprise and Lopez's relationship to it. *United States v. Murray,* 618 F.2d 892, 902–03 (2d Cir.1980). We conclude that Lopez, like Edwardo–Franco and Gallego, is entitled to an untainted analysis.

In summary, we direct that the judgments against all of the defendants be vacated; that the charges against Edwardo–Franco, Gallego and Lopez be retried; and that all of the charges against Castro–Munoz be dismissed.

### ON REHEARING

#### PER CURIAM:

The Government's petition for rehearing simply reiterates the arguments made in its brief on appeal. The exclusion of the testimony of Edwardo–Franco's former landlady on the basis that "[s]he can't be a corroborative witness," Panel op. at 1008, coupled with the preclusion of Edwardo–Franco's testimony as to background information about himself and about the inducements to him to move into the Birchwood Park Drive house, Panel op. at 1009, would alone have warranted a reversal of his and Gallego's conviction. When coupled with the other questionable rulings commented upon in our initial opinion, especially in light of the remarks made at sentencing, it is readily apparent that a retrial in the interest of justice is necessary. We stand on the points made in the panel opinion as to Castro–Munoz and Lopez.

As Justice Jackson once wrote, "There is, of course, strong temptation to relax rigid standards when it seems the only way to sustain convictions of evildoers." *Krulewitch v. United States,* 336 U.S. 440, 457, 69 S.Ct. 716, 725, 93 L.Ed. 790 (1949) (Jackson, J., concurring). This is especially true where the conviction is for a narcotics violation at a time when the country is engaged in a "war on drugs." However, a courtroom is not the proper place in which to fight such a "war." A defendant charged with a narcotics violation is presumed like every other defendant to be innocent until proven guilty beyond a reasonable doubt after a fair trial.