**UNITED STATES of America, Plaintiff–Appellee,**

v.

**W. Jason MITAN, Defendant–Appellant.**

**Nos. 91–1867, 91–2779.**

United States Court of Appeals, Seventh Circuit.

Argued April 3, 1992.

Decided July 9, 1992.

Rehearing and Rehearing En Banc Denied Aug. 19, 1992.

Rehearing Denied Sept. 28, 1992.

John H. Newman, Asst. U.S. Atty., argued, Criminal Div., Barry R. Elden, Asst. U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for the U.S.

Jeffrey B. Steinback, Leonard Goodman, argued, Genson, Steinback, Gillespie & Martin, Allan A. Ackerman, Chicago, Ill., for Jason Mitan.

Before BAUER, Chief Judge, EASTERBROOK, Circuit Judge, and NOLAND, Senior District Judge.[1]

BAUER, Chief Judge.

A jury convicted W. Jason Mitan of federal tax evasion and bankruptcy fraud, in violation of 26 U.S.C. § 7206(1) and 18 U.S.C. § 152, respectively. Mitan appeals his conviction, arguing primarily that the district court's treatment of his attorney denied him a fair trial. He also argues that the district court excluded certain evidence erroneously, and failed to give necessary jury instructions. Finally, he asserts that the bankruptcy fraud charge was time barred. We affirm.

## I.

Because of the nature of Mitan's challenges, we must begin our analysis with a detailed review of the background facts and trial.

### A. Background Facts

Mitan is a disbarred personal injury lawyer. He directed the firm of Mitan & Michelotti from 1974 until his disbarment in 1980. At trial, the government contended that Mitan continued to associate with his firm's successor organizations after his disbarment, and received income from their practices. Counts two, three, and four of the superceding indictment charged Mitan with tax evasion. According to the government, Mitan received $1,165,168 in income during 1984, 1985, and 1986, which he failed to report. Mitan received this income through a series of third-party checks from his successor law firms, and from the firms' payment of his personal expenses.

Mitan asked Stanley Wilcox to take over approximately 1,000 personal injury cases in the late-fall of 1979. He agreed to pay Wilcox $25,000 for monitoring the cases, and the name "Mitan & Michelotti" was changed to "Wilcox & Associates." Wilcox stated that most of the cases were referred out of the office to other attorneys, but Mitan wanted him to supervise their management. Mitan testified that he sold his practice to Wilcox for $5,000,000, but Wilcox denied the sale.

Mitan retained his office at Wilcox & Associates, and retained control over personal injury cases. Wilcox moved into the office in January 1980, and was involved in the practice until March 1980. In March, Wilcox moved to New York, and came to Chicago on a weekly basis. Because of his constant absence, another attorney, Dan Kuzman, was hired to supervise cases. The government presented evidence that Mitan continued to supervise new legal cases, and received income from them, from 1980 until 1986. Wilcox severed his relationship with Mitan at the end of 1980,

1. Honorable James E. Noland, Senior District Judge for the Southern District of Indiana, is sitting by designation.

but the office continued to use his name until mid–1981. Wilcox discovered in the late-spring or early-summer of 1981 that someone in Mitan's office made a rubber stamp of his signature. When he demanded its surrender, the stamp was turned over to him. The rubber-stamp incident terminated Wilcox's association with Mitan's office.

Mitan was also charged with bankruptcy fraud. Mitan filed a petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 501–554, on May 12, 1981. In his petition, Mitan claimed he had debts of $974,900 and assets of $2,950. He also stated that he had no property other than that listed in his petition, and that no one was holding anything of value in which he had an interest. His petition stated that he had only 30 outstanding cases, on which he was owed payment based upon *quantum meruit*, but that the value of these payments was unknown. Mitan actually retained a financial interest in these personal injury cases, and received $7,552 in proceeds from them through disguised checks paid between 1983 and 1986.

At a creditors' meeting held a month after Mitan filed his petition, Mitan informed his bankruptcy counsel, Richard Golding, and his creditors, that he had been paid for all his old cases. Contrary to these representations, in June 1981 Mitan tried to convince another attorney, Thomas Jordan, to take over 1000 personal injury cases, which Mitan valued at $18,000,000. (This was after the relationship with Wilcox soured.) Mitan told Jordan these cases would generate $6,000,000 in fees. On July 6, 1981, Jordan signed a contract which purported to transfer the practice from Wilcox to him. Wilcox's signature was on the agreement when Jordan signed it, but Wilcox and Jordan never discussed the transfer. Jordan revoked the contract on July 31, 1981.

Mitan's failure to reveal these existing assets was the initial predicate for the bankruptcy fraud. From 1981 until 1983, he continually represented to the bankruptcy trustee, Nicholas Dozoryst, that he had already sold his practice for a few thousand dollars, and that he had received and spent all the money he was owed by the time he filed his bankruptcy petition. Dozoryst asked Mitan for records documenting Mitan's personal injury cases. Mitan supplied no documents, and Dozoryst received court orders in 1981 and 1982 for the production of these documents. Mitan did not supply them.

Mitan continued to supervise the office after Wilcox and Jordan withdrew. The firm operated for several months under yet another attorney's name, Ernest Powell. Then, beginning in February of 1982, still another attorney, David Milks, became associated with Mitan's firm, and after the spring of 1983, the firm bore Milks' name. Mitan continued to call his secretary, Janet DeAndrea, daily and came to the office once or twice a week to supervise files and pick up checks. Mitan hired a bookkeeper and another secretary to help administer the personal injury cases. Thomas Mailloux, the bookkeeper, prepared accounting reports for each case. These reports listed the settlement amounts and deductions from the client's award for "loans" during the pendency of the case, attorneys' fees, and costs.

Clients were charged 25% to 40% for "fees", and a 3.5% "investigation fee." The 3.5% charge did not reflect actual investigative costs; it was simply a flat percentage of the settlements that was paid over to Mitan. The loans were made from Milks' office accounts. Checks for the investigation fees and loans were cut to the client from the firm's trust account, endorsed by the client, and given to Mitan. Milks received 15–25% of the fee award; Mitan got the rest. In addition, on his weekly visits to the office, Mitan gave Mailloux his personal bills to pay, including bills for credit card charges, Chicago Bears tickets, and newspapers. Mailloux testified these expenditures were not related to expenses for the Milks law office.

Mitan established Paralegal Services, Inc. in October 1985. The bookkeeper and one of Mitan's secretaries served as officers. Paralegal Services did not have separate offices from the Milks law firm; it

was simply used to establish two bank accounts. Checks were drawn on the Milks firm account, and deposited in the Paralegal Services accounts. One account was used to pay bills (including Mitan's personal bills), the other was used for payroll for staff at the Milks firm. Significant amounts also were expended on Mitan's personal expenses, and were paid at his direction to Mitan's friend, Janet McDaniel.

The Internal Revenue Service determined that in 1984, 1985, and 1986, Mitan received $1,165,369 in unreported income through disguised checks and personal expense payments from the Milks firm.

### B. The Trial

Mitan was represented at trial by Julius Lucius Echeles. It is Echeles' zealous representation of Mitan that forms the basis of Mitan's due process challenge. To provide the reader with a sense of how the trial proceeded, we shall examine in some detail Echeles' opening statement, which is fairly indicative of his behavior during the rest of the trial. We will examine other incidents upon which Mitan bases specific objections in the analysis section.

Echeles set the tone for the trial during his opening statement. Trial Transcript ("Tr.") at 26–31. He began with an attempt to define reasonable doubt for the jury. After a sustained objection, it took the court four attempts to get Echeles to stop discussing reasonable doubt. Tr. at 27–28. Next, Echeles attempted to outline the contents of the first indictment issued against Mitan, which did not contain the bankruptcy fraud charges. The government objected to Echeles' comments about a superceded indictment, and the court sustained the objection. Echeles began talking about the initial indictment again. The jury was excused.

The court told Echeles that he seemed to be ignoring its rulings, and explaining his positions to the jury despite them. Tr. at 31. The Court continued: "Now, I would suggest that we're off to a rather heated start in this trial, and that's the last thing that experienced counsel and the Court really wants, and so I would suggest that we

take a more reasonable approach as we continue...." Tr. at 32. Echeles did not heed this warning, and continued to push his luck. In fact, he immediately resumed his argument about the superceded indictment. Tr. at 31–34. Ultimately, the trial judge admonished Echeles, who still refused to yield the point. Echeles' contentiousness throughout the trial tried the court's patience. Mitan argues that the court's attempts to curb his behavior indicate bias. In our analysis of this argument, we shall review the particular incidents to which Mitan refers. After a two-week trial, the jury convicted Mitan on all counts.

### II. Analysis

Mitan raises five challenges to his conviction. He argues that the district court's management of the case deprived him of due process; that the trial court committed two evidentiary errors; that the district court erroneously refused one of the proffered jury instructions; and that the bankruptcy fraud charge was time barred.

### A. Due Process Challenge

Mitan argues he was denied due process because the "trial judge harbored feelings of hostility and prejudice towards defense counsel and towards the defense case...." Appellant's Br. at 23. He contends that the unfairness of his trial requires reversal because the judge's open hostility influenced the jury. Mitan groups his objections to the trial court's handling of his trial in four categories: (1) repeated interference in the trial apparently to assist the prosecution; (2) unwarranted castigation of defense counsel; (3) comments reflecting apparent bias and prejudice against defendant's case; and (4) uneven application of evidentiary rules reflecting bias and prejudice.

We find Mitan's argument on these points to be meritless, and, therefore, will not describe in detail each instance of alleged mishandling. We find that Echeles' behavior exceeded the limits of zealous advocacy, and that the experienced trial judge properly exercised control of the proceed-

ings. Mitan complains that the trial judge was unduly harsh in his treatment of Echeles, but a concession in his brief is enlightening: "It is conceded that counsel did not always follow the most technically sound procedure in questioning witnesses and presenting evidence. Defense was also frequently imperfect in stating the proper basis for objections or the proper response to government objections." Appellant's Br. at 31–32. If an attorney fails to lay a proper foundation for proffered evidence, or to state the correct basis for an objection, he cannot complain that a trial judge's refusal to allow the evidence or sustain the objection is biased. The rules of evidence are not advisory—they are obligatory.

Nevertheless, Mitan argues that the judges warnings were improper castigation. In addition to the judge's comments during Echeles' opening statement, *see supra*, Mitan complains of four other instances of strong words from the trial court.

■ During the cross-examination of Thomas Mailloux, Mitan's bookkeeper, Echeles questioned Mailloux about Mailloux Exhibit No. 1. Tr. at 268–69. Some of the numerical figures on the document were in Mailloux's handwriting. Echeles asked Mailloux:

Q. Do those [numerical figures] represent the cash payments to investigators in the years 1983 and 1986?

A. That's what somebody typed on here. I didn't write that on here.

Q. Where did you get these figures?

A. I don't know. To me, this is a piece of paper with my handwriting with names and numbers. I don't remember making it up.

Q. You have no recollection of the document at all?

A. No, sir. It's my handwriting, I'll say that, so I had to do it, but—

\* \* \* \* \* \*

A. You know, if somebody typed something on top of a sheet that I wrote doesn't mean that's what it is.

Q. Well—

Mr. Silverman:[2] May I see that please?

Mr. Echeles: Yes.

By Mr. Echeles:

Q. Without the typewritten legend—

Silverman: Judge, can we have a side bar please?

The Court: Yes.

Silverman: Judge, excuse me one minute, I never saw this on the copy that he gave to me. This typed [sic] was not on—was not on my copy of the exhibit. I had no idea—this is the—this is not what I got.

Echeles: That's true.

Silverman: He's asking him—

The Court: All right, just a second. Members of the jury, you are excused for a few minutes, and—

Echeles: Judge—

The Court: —the witness may leave the witness stand.

Echeles: Judge—

The Court: Just a minute, counsel.

Echeles: Well, let him tell you what's on the document.

The Court: Please be seated. All right not counsel. Others. Mr. Silverman, you may argue the point you began to raise at side bar.

Silverman: Your Honor—

The Court: The jury is absent at this point, the witness has left the witness stand, you may proceed.

Silverman: About two days ago, I was handed a copy of the sheet of paper by either Mr. Echeles or Ms. Kramer [Echeles' co-counsel]. That sheet of paper has a number of names on the left-hand margin and a number of numbers on the right-hand margin, and those numbers add up to $1,103,631. There is nothing that appears above the names or numbers at the top of the sheet of paper that I was given. At the bottom of the sheet of paper, in handwriting that—I don't know exactly whose handwriting this is—it says, "Mailloux's handwritten schedule of payments to investigators"—

**2.** Assistant United States Attorney.

Echeles: Uh uh, read it—

Silverman: I will.

Echeles: You didn't read it—you didn't read "cash payments".

Silverman: I will.

Echeles: You didn't read it right.

The Court: Your objection is overruled, and you will be given an opportunity to respond.

Echeles: But he—but, Judge, please, he didn't read it right.

Silverman: May I please finish, Mr. Echeles.

The Court: Proceed. Complete your statement, Mr. Silverman.

\* \* \* \* \* \*

Silverman: In the center of the statement that I just read from, on the bottom of the page in handwriting, Judge, is the word "cash." I assumed that when I was given this piece of paper that this note meant that this—that everything on the top half of the page represented Mailloux's handwritten schedules of cash payments to investigators from '83 through '86, and that was the reason why he wrote—or someone wrote this note at the bottom of this page.

I did not have any idea that the exhibit, when it was shown to the witness, had typed at the top of the page—I still don't know exactly what it says—

Echeles: But is he complaining that the legend, the same legend—

The Court: The issue may involve the fabrication of evidence.

Echeles: Yes.

Silverman: It says, "Investigator, Payments 1983–1986". Next to that is the word "Cash, Written by Tom Mailloux". That typing was not put on there by Tom Mailloux. I had no idea that the exhibit that was shown to Mr. Mailloux had that typed at the top of the page, and the reason that I didn't know that, your Honor, is because on the copy that I was given, that typing does not appear at the top of the page.

The Court: If I ask you to make these statements under oath, Mr. Silverman, would your statement be the same?

Silverman: Yes, it would.

The Court: All right, Mr. Echeles, you may proceed.

Echeles: The only difference between the document I showed the witness and the document the Government had is that the legend "Mailloux's handwritten schedule of cash payments to investigators '83 thru '85" is the same. The only difference is that the handwritten legend that was turned over to the Government is on the bottom and the one that was shown to Mr. Mailloux is on top.

The Court: What is on top?

Echeles: On top it says, "Investigator, Cash Payments 1983–1986, Written by Tom Mailloux." On the bottom—

The Court: Now, before you get to the bottom, who typed that on the top?

Echeles: We typed it.

The Court: You typed that?

Echeles: Well, I didn't do the typing, but—

The Court: Who did?

Echeles: I—I caused it to be typed.

The Court: You caused someone to type that on the top of the document?

Echeles: Yes, your Honor.

The Court: But the document you gave to the Government did not have that on there?

Echeles: It didn't have—it had it on the bottom.

The Court: But when you gave the document to the witness, it was the one that you prepared and you caused to have the typing on the top?

Echeles: Yes, your Honor.

The Court: That is improper conduct, and I am going to instruct this jury to totally disregard all this testimony with respect to that document. It has been contaminated and is inadmissible, and you are admonished.

Tr. 270–75. Mitan asserts that this ruling illustrates the trial court's bias and prejudice against the defendant. This assertion

is the height of chutzpah. Echeles altered an exhibit and then attempted to cross-examine a witness on the alteration. Arguing that the court's admonishment on this point is "unwarranted castigation" borders on the absurd.

■ To support his contention that the court castigated Echeles unjustifiably, Mitan also points to the court's admonishment of Echeles in front of the jury when Echeles persisted in a line of inquiry after the court sustained a hearsay objection. Tr. at 639. Echeles clearly was attempting to illicit hearsay testimony from the witness, Jeannine Maciejczak. Within five transcript pages, the Government sustained six hearsay objections. Tr. at 639–643. Nevertheless, Echeles persisted; the trial judge exercised admirable restraint in relying on admonishments to curb this conduct. There is no question that the district court's rulings were proper, or that Echeles failed to heed them.

■ Another incident that purports to show the trial court's prejudice involved an order entered *nunc pro tunc* in Mitan's bankruptcy proceeding. Sandra Rasnak of the United States Trustee's Office testified as the government's general bankruptcy expert. She was not involved in Mitan's bankruptcy, and simply had reviewed the file before testifying. Tr. at 414. Echeles attempted to cross-examine Rasnak on the meaning of *nunc pro tunc*. The judge excused the jury to discuss the order. The order was entered in Mitan's bankruptcy case in November 1985. Tr. at 424. The order was entered by the bankruptcy judge who presided in Mitan's case upon a motion by Mitan's bankruptcy counsel, Richard Golding. The motion asked that "the order of conversion of November 11, 1981 be amended *nunc pro tunc* so as to delete all references to the 'Bankruptcy Act,' and to substitute therefor references to the 'Bankruptcy Code,' and that the order of discharge of October 19, 1981 be conformed." Tr. at 428 (Motion being read into the record). The language of the order echoed the motion.

Echeles stated there was no record of a hearing before the judge who signed the order. The district court was concerned because existing law, which it cited at length to the parties, holds that *nunc pro tunc* orders are designed to clear up ministerial errors, not to make substantive amendments to the record or to add something to the record not previously included. Tr. at 421–22.

Further, neither the order nor the motion cited any rule in the Bankruptcy Code to support the filing of the motion or the issuance of the order. Tr. at 429. The district court correctly found that Golding's bankruptcy motion was a motion to amend. Then it stated:

The Court: My reaction to it is that it's probably a fraud upon the Court.

Echeles: What is a fraud upon the Court?

The Court: Well—

Echeles: That's an unfair thing for your Honor to state, that this order entered by the same Bankruptcy Judge in 1985 with respect to his order, that the motion filed by Golding was a fraud upon the Court. With due respect—with all respect to this Court, that's an unfair and unwarranted statement.

The Court: Well, because what is attempting to be done in that order is contrary to what the cases I have just read to you; it is attempting to do exactly what a nunc pro tunc cannot do.

Echeles: I respectfully disagree with your Honor.

The Court: It is attempting to make a motion to amend something that occurred substantively previously. It's a motion to amend; it is not a nunc pro tunc, not a true nunc pro tunc. It is not even styled a motion to enter nunc pro tunc, and it is pursuant to no rule of bankruptcy, and certainly, none is cited within the motion itself.

Echeles: Judge—

The Court: And also, you're telling me now the order was entered four years after an event, in November of 1985, and that there is no transcript of what occurred in the Bankruptcy Court regarding that order?

Echeles: We have not been able to find any transcript or the court reporter who recorded the minutes. Judge, at this time, defendant respectfully moves for a mistrial, most respectfully. Tr. at 429–30. The district court properly denied the motion for a mistrial. There was no motion before the court to admit the document, and no manifest injustice. Further, the remark about the fraud, given the record presented to the district court, does not seem entirely unwarranted. It was directed at Mitan's bankruptcy counsel, not Mitan or Echeles. There does not appear to be any statutory authority for Golding's motion in the Bankruptcy Code.

More importantly, the judge's comment was outside the presence of the jury and therefore, could not have influenced their evaluation of Mitan's counsel or his substantive defense. It is also clear that the judge's concerns about the validity of the document did not indicate prejudice against the defendant, but concern for proper cross-examination. Rasnak knew nothing about the order; Echeles was permitted to introduce the order when Golding testified and to question him about it. Tr. at 611.

■ The last of Mitan's contentions regarding the district court's handling of the trial which we shall examine is his allegation that the judge did not apply the rules of evidence evenly. Mitan argues that the prosecutor was allowed to cross-examine witnesses with documents not in evidence, while his counsel was not allowed to do so; that the prosecutor was allowed to ask hypothetical questions, but Echeles was not; and that the judge applied relevancy and hearsay rules unfairly.

The record shows that Mitan is comparing apples to oranges. For example, Echeles was not permitted to cross-examine the bookkeeper on a document containing rank hearsay during the government's case-in-chief. Echeles was not seeking to impeach Mailloux; he was trying to admit the substance of the document. Tr. at 264–65. This document, Mailloux Defendant Exhibit 1, which we have discussed above, had not yet been admitted, and Mailloux did not recognize it. Once Echeles made a proffer that Mitan would take the stand and testify that Mailloux prepared it, the court allowed Echeles to proceed. Tr. at 266–67. It was perfectly proper to require Mitan to establish a foundation for the document. Of course, the court discovered later that Echeles altered the document, but we have already told that story.

■ Mitan also points to the debacle over the *nunc pro tunc* order as an instance in which he was not allowed to cross-examine a witness on a document not in evidence. Tr. at 431–32. But as we have discussed, there was a genuine question on the authenticity of the order, and the witness Echeles sought to cross-examine had no knowledge of it. Rasnak was a general expert on bankruptcy law, and had no knowledge of Mitan's case. She could not testify about the significance of the order. Moreover, the judge permitted Echeles to admit the document when Golding testified. On the other occasions Mitan cites, Echeles tried to cross-examine witnesses during the government's case-in-chief, using documents that contained hearsay, which the witness had not prepared, and for which no foundation had been laid. Tr. at 580–81, 504–85. It was proper to bar such cross-examination.

Mitan analogizes these instances to the government's use of documents. The government cross-examined a representative of the Desert Inn & Casino and Ceasar's World Resorts about Mitan's gambling activities in Ceasar's casinos. Tr. at 681. Specifically, the Government questioned the representative about Ceasar's records of Mitan's line of credit. Tr. at 687. Echeles objected to the question because no records were in evidence. The court asked if the government was going to put the records into evidence, and tie them up. Tr. at 687–88. The government responded in the affirmative, but the court warned that the testimony would be stricken if the evidence was not tied up. Tr. at 688. This ruling is entirely proper, and not evidence of bias. The representative was testifying about the records kept by his employer, and the Government laid the foundation for the records by having the

witness testify about Mitan's gambling and credit history at the casinos. Tr. at 685–88.

Mitan cannot complain that he was prejudiced when his attorney was not allowed to introduce evidence when he failed to lay the proper foundation for it, or attempted to introduce it at the wrong time. Pointing to instances when the government followed the proper steps, and was allowed to cross-examine witnesses on documents not yet formally admitted does not indicate that the trial judge was biased. Rather, it indicates that Echeles tried to sidestep the rules of evidence, and failed.

■■■ Mitan's argument about the court's relevancy rulings suffers from similar weaknesses. Mitan complains that the court allowed the government to introduce a hearsay conversation between Nicholas Dozoryst, the bankruptcy trustee, and the prosecutor. Tr. at 1066–77, 1078–79. In fact, Echeles opened the door to the testimony regarding Dozoryst's contacts with the prosecutor, because he suggested that the government prompted Dozoryst to lie. Tr. at 1066. Mitan's contention in his reply brief that Echeles did not make this suggestion simply misrepresents the record. Appellant's Reply Brief at 17.

> Q. And you're under the obligation to satisfy the Government with your testimony, are you not?
>
> A. No.
>
> Q. You're not looking to them for favorable treatment in your plea-bargaining agreement? You're looking for their favorable consideration, are you not?
>
> A. I—I don't think I'm—I don't think I'm going to get any favors from the Government in my own matters.

Tr. at 1076–77. Echeles continued in this vein for several transcript pages. Here, Mitan argues that the court improperly allowed the government to develop further hearsay evidence on this point, i.e. Dozoryst's conversations with the prosecutor in his own case regarding the impact of his testimony at Mitan's trial. Tr. at 1079. The trial judge ruled correctly that Echeles opened the door on the issue, and it was proper to admit the testimony.

Mitan argues that because this hearsay was admitted, Mitan should have been permitted to testify, for the truth of the matters asserted, about an oral agreement Mitan "overheard" between attorney David Milks and his father, Joseph Mitan. Tr. 721–22. Echeles maintained through four sustained hearsay objections that this oral agreement was not hearsay. Tr. 721–24. The overheard conversation is an out-of-court statement offered for the truth of the matter asserted. It is clearly hearsay, and falls within none of the exceptions. Fed. R.Evid. 801–803. Mitan argues here that the failure to admit this hearsay is evidence of the district court's prejudice. We simply find no merit in the analogy between Echeles' attempt to introduce the overheard conversation, and the government's use of testimony to rebut Echeles' suggestion that a witness is lying at the government's behest.

Mitan's remaining assertions of the district court's prejudice and unwarranted castigation are equally without merit. We have considered the court's *sua sponte* attempts to curb Echeles' flamboyant courtroom behavior, and find them entirely justified. *See* Tr. at 400–45, 628; 738–54. We have also reviewed the court's evidentiary rulings and find that the judge properly required Echeles to comply with the rules of evidence, and imposed the same standards upon the government. *See* Tr. at 504–11, 581–82; 412–14, 596–97, 627–31, 920–22, 1234–35.

Mitan's reliance upon such cases as *United States v. Dellinger*, 472 F.2d 340, 386 (7th Cir.1972), *cert. denied*, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973), and *United States v. Edwardo–Franco*, 885 F.2d 1002 (2d Cir.1989), *Walberg v. Israel*, 766 F.2d 1071 (7th Cir.1985), *cert. denied*, 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985), and *United States v. Spears*, 558 F.2d 1296 (7th Cir.1977), is misplaced. In *Edwardo–Franco*, the judge made comments about the Colombian defendants reflecting ethnic prejudice. 885 F.2d at 1005. In *Walberg*, when the defendant took the stand, the trial judge answered the questions posed by defense counsel.

766 F.2d at 1073. This, and other active criticism of the appointed attorney (the judge said: "don't ever come to me with your bill on this thing, because I'm not going to pay for all these motions ...") required a new trial. *Id.* at 1073, 1078. In *Spears,* the defense counsel referred to a comment made by the judge at a side bar during his closing argument. The judge told the jury the comment bordered on a lie, and the exchange between counsel and the judge degenerated rapidly. The judge threatened to fine counsel, and reiterated in open court that he heard counsel lie to the jury. 558 F.2d at 1297. The stretch between these cases and the instant one is significant, but Mitan's comparison of his case to *United States v. Dellinger,* 472 F.2d 340 (7th Cir.1972), borders on the ridiculous. During that five-month trial, one of the defendants was intermittently bound and gagged in the courtroom, and marshals were in constant attendance to keep order. *Id.* at 385. The trial judge issued bench warrants against four withdrawing defense lawyers, and incarcerated two of them without bond. *Id.* at 386 n. 80. On other occasions, the judge accused the attorneys of lying, and even recessed the court when he disapproved of an attorney's posture during cross-examination. *Id.* at n. 84

In contrast, the judge in this case did not impugn Echeles' integrity, or make the personal attacks against either counsel or the defendant that are the focus of the cases on which Mitan relies. In fact, the experienced trial judge properly managed Echeles' contentious behavior, and we find he exhibited no prejudice against either the defendant or his attorney.

## B. Evidentiary Rulings

▮ Mitan next asserts that the district court erred in excluding two pieces of evidence. The first is the Mailloux Exhibit with the contested legend which we discussed in the previous section. The second is the testimony of Marianna Lopez. We shall consider each ruling in turn.

The court barred Defense Mailloux Exhibit No. 1, *see supra* 1171–72, Tr. at 270–75:

The Court: That is improper conduct, and I am going to instruct this jury to totally disregard all this testimony with respect to that document. It has been contaminated and is inadmissible, and you are admonished.

Tr. at 275. Nevertheless, Echeles removed the typed legend, renumbered the exhibit 6–A, and introduced the document again with a group of others during his examination of Mitan. Tr. at 732, 937. The government did not object when the document was admitted during Mitan's examination, apparently because it did not realize until a second witness was examined on the stricken document that Mitan's counsel had introduced it with a different number. Tr. at 939–40, 944.

As soon as the government discovered the problem, as defense counsel showed the stricken document to the jury, it requested a side bar. Tr. at 938. At side bar, the court reiterated that the entire document had been stricken because counsel's alteration contaminated it. Tr. at 940–41. Moreover, the district court found that counsel intentionally disregarded its ruling on the document, and that it was improper to include the document with a group of others admitted when Mitan testified, without bringing it to the court's attention. Tr. at 945. We believe the document was properly excluded and that counsel acted improperly.

Again, the authority Mitan relies upon in his brief does not support his position. In *United States ex rel. Enoch v. Lane,* 581 F.Supp. 423, 430 (N.D.Ill.1984), *aff'd,* 768 F.2d 161 (7th Cir.1985), *cert. denied,* 475 U.S. 1053, 106 S.Ct. 1281, 89 L.Ed.2d 588 (1986), the district court granted the plaintiffs' habeas petition because the state court improperly excluded a defense witness. The witness, who corroborated the defendants' story, was excluded because the witness's name was not on the pre-trial witness list provided to the government. By contrast, in *Taylor v. Illinois,* 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1987) the Supreme Court affirmed the exclusion of a defense witness whose name had not been provided to the government before

trial, because it appeared "witnesses [were] being found that really weren't there." *Id.* at 404, 108 S.Ct. at 650. The Court noted that the exclusion of such witnesses is a necessary tool to prevent fabrication. *Id.* at 412–13 n. 17, 108 S.Ct. at 654–55 n. 17. In fact, *Taylor* supports the trial judge's action in this case, because the Court found that if misconduct is willful, "the severest sanction [(exclusion)] is appropriate." *Id.* at 417, 108 S.Ct. at 657. Here, the trial judge found that Mitan (or his counsel) fabricated or contaminated the exhibit. A criminal defendant has no right to present such evidence to the jury, and barring its presentation does not evince judicial prejudice.

 The other evidentiary ruling Mitan challenges is the court's exclusion of a surrebuttal witness. In his case-in-chief, Mitan testified that Stanley Wilcox, another attorney, agreed to take over Mitan's existing cases. Mitan stated that they entered a written contract, which was admitted as Mitan Exhibit 1. Under the contract, Wilcox was to make installment payments totalling $550,000. Tr. at 710–11. In rebuttal, the government presented the testimony of Stanley Wilcox. Wilcox denied signing the agreement, or authorizing anyone to sign for him. Tr. at 1133–34. Wilcox testified that Mitan's firm had made a rubber stamp of his signature without his knowledge. When he discovered the stamp, he demanded its return and severed his relationship with Mitan. Tr. at 1131–32. Wilcox stated that he had agreed to manage the cases, but never signed a formal contract. *Id.* He asserted that his signature had been stamped on the agreement without his knowledge. Tr. at 1134–35.

Mitan sought to present surrebuttal testimony from Marianna Lopez, one of Wilcox's former employees. According to Mitan, Lopez would have testified that she and another employee spoke to Wilcox in a telephone conference call, and that Wilcox had authorized the other employee to sign his name to the contract. The district court refused to allow the surrebuttal witness. She was in the witness waiting room

when Mitan testified, and was available to support his testimony. The court found that there was no surprise from Wilcox's testimony, and carefully reviewed the role of the contract in the trial. It found that Mitan had "a full and adequate opportunity to present evidence regarding the contract and its execution. ... Mr. Echeles candidly admits that he had ... Marianna Lopez ... available as a witness, and certainly, he ... knew of her and did have the opportunity to call her." Tr. at 1236.

Federal Rule of Evidence 611(a) confers upon the trial judge the duty to control

> the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harrassment or undue embarrassment.

Fed.R.Evid. 611(a). We will not disturb a trial court's decision regarding the admissibility of surrebuttal testimony unless there is an abuse of discretion. *United States v. Chapman*, 954 F.2d 1352, 1374 (7th Cir. 1992). "Indeed, great deference is accorded to the discretion and judgment of the trial court when granting and/or denying a party's motion for rebuttal or surrebuttal testimony." *United States v. Gaertner*, 705 F.2d 210, 217 (7th Cir.1983), *cert. denied*, 464 U.S. 1071, 104 S.Ct. 979, 79 L.Ed.2d 216 (1984).

The trial court did not abuse its discretion. Lopez was available to testify during Mitan's case-in-chief, and the trial court found that "it may well have been the strategy of the defendant to call her or not call her." Tr. at 1237. Moreover, despite Mitan's contentions, the validity of the contract was not a new issue. Indeed, if it were, why was Lopez waiting to testify during Mitan's case-in-chief?

Mitan also argues that Wilcox raised another new issue—that Mitan asked him to lie about the contract. Wilcox testified that Mitan asked him before the trial to testify that he, Wilcox, authorized his signature. Tr. at 1137. The defense characterizes this statement as an "unrelated charge of criminal conduct." Appellant's

Br. at 45. There was no criminal charge, and during the court's side bar on the surrebuttal witness, Mitan's counsel did not argue about Mitan's pre-trial request to Wilcox. Tr. 1202–07; 1224–37. Regardless, Lopez could not have testified about whether Mitan asked Wilcox to lie about his authorization, even if her testimony might have bolstered Mitan's contention that Wilcox authorized the signature in the first place.

The trial court carefully reviewed the circumstances surrounding the proffer of the surrebuttal witness, and declined it. This decision falls squarely within the sound discretion of the district court, and we will not disturb it.

## C. Refusal of Proposed Jury Instruction

■ Mitan contends that the district court committed reversible error when it refused two jury instructions about willfullness under *United States v. Cheek,* — U.S. ——, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). Because tax evasion is a specific intent crime, the government must prove that the defendant act willfully. *Id.* 111 S.Ct. at 607. Mitan's defense was that he believed he was not required to report the amounts he received through the law firm as income. The trial court accepted the government's instruction which provided:

> If you find that the defendant in good faith believed that the income he reported on his income tax returns for the years 1984, 1985, and 1986 was true and correct and that he had no other income that he was required to report, even if such belief may have been objectively unreasonable, then you should find him not guilty of Counts 2, 3, and 4.

Tr. at 1362. Mitan submits that the instruction was inadequate because (1) it failed to inform the jury that it "must consider whether Mitan subjectively believed" that he did not owe taxes on the income he received, and (2) it failed to define "objectively reasonable."

Mitan tendered the following instruction:

> If you find that the defendant in good faith believed that he had no legal duty

to report more income than he did, you should acquit him. There is no requirement that a defendant's good faith belief, that he had no legal duty to report more income than he did, must be rational in order to negate willfulness.

Tr. 1208–10.

Mitan's challenges to the court's instruction are meritless. "In assessing claims of error in jury instructions, substantial discretion is given to the trial court with respect to the specific wording of the instructions." *United States v. Penson,* 896 F.2d 1087, 1090 (7th Cir.1990). The trial court is not required to "give a proposed instruction if the essential points are covered by those that are given." *Id.* (quoting *United States v. Xheka,* 704 F.2d 974, 987, (7th Cir.) *cert. denied,* 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983)). The instruction given by the district court satisfied the requirements of *Cheek,* and covered the essential points of Mitan's proffered instruction. *Cheek* does not require a sentencing court to emphasize the defendant's subjective beliefs; it merely forbids the court to instruct a jury to disregard them. *Cheek,* 111 S.Ct. at 611.

■ Further, as to the second complaint, that there was no definition of "objectively reasonable," Mitan did not ask for an instruction on its meaning at trial. Therefore, he has waived this argument, and we review the instructions for plain error. Fed.R.Crim.P. 30. *See United States v. Brothers,* 955 F.2d 493, 496 (7th Cir.1992) *(petition for cert. filed* Apr. 6, 1992); *United States v. Stodola,* 953 F.2d 266, 272 (7th Cir.1992). "A reversal on the basis of plain error can be justified only when the reviewing court is convinced that it is necessary in order to avert an actual miscarriage of justice." *Id.* (quoting *United States v. Requarth,* 847 F.2d 1249, 1254 (7th Cir.1988)). Further, when we determine whether a defect in a jury instruction constitutes plain error, "we must examine the entire record before us, and determine whether the instructional mistake had a probable impact on the jury's finding that the defendant was guilty." *Id.* It is clear that the judge's failure to define "objective-

ly reasonable" was not clear error. It was not required by *Cheek*, and Mitan cites no authority to support his argument that the court should have defined this term.

We have reviewed Mitan's remaining argument, that the bankruptcy charge was time-barred, and find that it also lacks substance, and does not merit discussion.

### III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.