**UNITED STATES of America, Appellee,**

v.

**Arthur TARRICONE, John Pabone, Dominic A. Bombace, Defendants,**

**John Barberio and Marat Balagula, Defendants–Appellants.**

**Nos. 1175, 1176, Dockets 92–1622, 92–1687.**

United States Court of Appeals, Second Circuit.

Argued March 17, 1993.

Decided June 24, 1993.

Scott A. Schumacher, U.S. Dept. of Justice, Washington DC (James A. Bruton, Acting Asst. Atty. Gen., Robert E. Lindsay and Alan Hechtkopf, U.S. Dept. of Justice, Zach-

ary Carter, U.S. Atty., of counsel), for appellee.

J. Shane Creamer (Mark A. Nation, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, PA), for defendant-appellant John Barberio.

Ephraim Savitt, New York City, for defendant-appellant Marat Balagula.

Before: ALTIMARI and WALKER, Circuit Judges, and LASKER,* District Judge.

LASKER, District Judge:

John Barberio and Marat Balagula appeal from judgments of conviction entered in the United States District Court for the Eastern District of New York in 1992 following a jury trial. The indictment charged Barberio, Balagula and three additional defendants with one count of conspiracy to evade the federal excise tax on the sale of gasoline in violation of 18 U.S.C. §§ 371 and 3623, and two counts of attempted excise tax evasion in violation of 26 U.S.C. § 7201 and 18 U.S.C. §§ 2 and 3623. Barberio was convicted on the first and third counts and sentenced to three years' imprisonment, the sentences to run concurrently, fined $100,000 and assessed $100. Balagula was convicted on all three counts and sentenced to five years' imprisonment on each of counts one and two, the sentences to run consecutively, five years probation and an assessment of $150. Balagula's sentence is to run consecutively to an eight year prison term he is presently serving.

Barberio appeals on the ground that the District Court erred in denying him a posttrial evidentiary hearing regarding the effectiveness of trial counsel's assistance. Balagula argues on appeal that the District Court committed reversible error in admitting certain testimony by one John Quock primarily because the criteria for the admission of "other act" evidence under Fed.R.Evid. 404(b) were not satisfied. In addition, Balagula contends that his sentence was improperly enhanced by the District Court because of his foreign national origin.

For the reasons discussed below, we conclude that Barberio's case should be remanded for an evidentiary hearing on his claim of ineffective assistance of counsel, but that Balagula's contentions are without merit and his conviction and sentence are affirmed.

## BACKGROUND

Barberio, Balagula and their three co-defendants were in the gasoline wholesale business. They were charged with participating in the evasion of over $400,000 in gasoline excise taxes for the last quarter of 1985 and the first quarter of 1986. During that time, federal law imposed an excise tax of nine cents per gallon on sales of gasoline. However, sales between companies holding a Registration for Tax–Free Transactions, a so-called "Form 637," from the Internal Revenue Service were tax exempt. The defendants were charged with using false invoices to disguise the taxable gasoline sales of a company called A. Tarricone, Inc. ("ATI") as tax exempt transactions between Form 637 holders.

At trial, the government produced evidence that the defendants had devised a "daisy chain" scheme to avoid the payment of the federal excise tax. Under this arrangement, ATI, a Form 637 company, purchased barge loads of gasoline from other Form 637 holders and then created fictitious invoices for sales to a transient front company called Conlo, Inc., which also held a valid Form 637. However, these purported sales to Conlo never took place; Conlo operated only to allow ATI to document the fictitious transactions. ATI, in fact, sold the gasoline to non-Form 637 holders, including Barberio and Balagula, and accordingly should have paid the federal excise tax on these sales. The conspirators contemplated that Conlo would subsequently be conveniently dissolved and would be unavailable to pay the tax.

To complete the daisy chain, the defendants used another front company called

* Hon. Morris E. Lasker, Judge, United States District Court for the Southern District of New York, sitting by designation.

Beck Equities, Inc., which did not have a Form 637, to issue invoices for fictitious sales to the non-Form 637 holders which were actually buying the gasoline directly from ATI. At the end of this contrived process, it appeared on paper that ATI had sold the gasoline tax-free to Conlo, Conlo had in turn sold the gasoline to Beck Equities and Beck Equities had sold it to the end purchasers. Although Conlo, as a Form 637 holder selling to a non-Form 637 holder, should have paid the federal excise tax, no taxes were ever paid.

The jury convicted Barberio of knowingly participating in the scheme by purchasing gasoline tax free from ATI on behalf of a company called Shoreline Oil Co. Balagula was convicted of purchasing gasoline tax free from ATI for a company called Hamilton Oil Brokers and of enlisting ATI as the gasoline supplier for the tax evasion scheme.

### DISCUSSION

1. *John Barberio.*

One significant piece of evidence presented by the government tying Barberio to the tax evasion scheme was his alleged handwriting on a so-called "throughput agreement," Government Exhibit 31–1. A throughput agreement allows a company to store gasoline in a terminal for a fee and withdraw it as needed. On the cover page of Exhibit 31–1 there are handwritten insertions which give the name of the throughput customer, in this case Beck Equities, the address of that company, and the date of the agreement. At trial, Louis Capossela, Barberio's boss, testified that he "would think" that that handwriting was Barberio's. Moreover, Joanne DeVito, Capossela's secretary, testified without qualification that the handwriting on the throughput agreement was Barberio's. In addition, DeVito testified that the handwriting on another document, Government Exhibit 31–11C, which was a note showing an address for a branch of the Bank of New York in Yonkers, New York and an account number for "A. Tarricone, Inc." also was Barberio's. Barberio's counsel conceded at trial that the writing on the latter exhibit was Barberio's.

Barberio's ineffective assistance claim is based on trial counsel's failure to consult a handwriting expert to determine whether the handwriting on the throughput agreement was Barberio's. After the verdict, Barberio discharged his trial attorney and retained new counsel. Barberio then filed a motion for a new trial and subsequently a supplemental motion for a new trial based on the ineffective assistance of his trial counsel. These motions were summarily denied by the District Court. Thereafter Barberio moved for reconsideration of his earlier motion and requested an evidentiary hearing on the claim of ineffective assistance of counsel. Barberio contended that at a hearing he would be able to establish that his trial counsel had failed to consult an expert to determine whether the handwriting on the throughput agreement was Barberio's and that the handwriting, in fact, was not Barberio's. He argued that, if counsel had put expert testimony before the jury that Barberio's handwriting was not on the throughput agreement, there would have been a reasonable probability that the jury would not have found him guilty. Barberio also sought to present other evidence bearing on trial counsel's ineffectiveness, including his failure to call certain "key" defense witnesses. The District Court summarily denied the motion for reconsideration.

Barberio contends that his post trial motions set forth a viable claim of ineffective assistance of counsel and that the District Court erred in refusing to grant him an evidentiary hearing. We agree.

To maintain a claim of ineffective assistance of trial counsel in a criminal case, a defendant must establish both "that counsel's representation fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The question presently before us is whether Barberio has presented a sufficient claim

to entitle him to a hearing as to whether his trial counsel did act ineffectively. To prevail on his motion for a hearing, Barberio must establish that he has a "plausible" claim of ineffective assistance of counsel. *See United States v. Matos,* 905 F.2d 30, 33–34 (2d Cir. 1990); *see also United States v. Cruz,* 785 F.2d 399, 404 (2d Cir.1986) ("[W]ere we to deem the [ineffective assistance] claim viable, we would very likely have to remand to the district court for the purpose of developing a full factual record following an evidentiary hearing."). At this preliminary stage he is not required to establish that he will necessarily succeed on the claim, and indeed, if he could presently prove that proposition, no hearing would be necessary.

We now examine whether Barberio has set forth a plausible or viable claim under the *Strickland* test.

i. *Unreasonableness of trial counsel's performance.*

Barberio argues that trial counsel's failure to consult a handwriting expert was unreasonable because of the "paramount importance" at trial of the testimony of the two witnesses that the handwriting on the throughput agreement belonged to him. He points out that the American Bar Association Standards for Criminal Justice, which were accepted by the *Strickland* court as a proper guide for determining what is reasonable conduct, require counsel to "conduct a prompt investigation of the circumstances of the case and to explore all the avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." American Bar Association Standards for Criminal Justice Standard 4–4.1 (2d ed. 1980 & Supp.1986). Accordingly, Barberio maintains that defense counsel was obligated, at a minimum, to retain an expert to evaluate the handwriting on the throughput agreement so that counsel could make an informed decision about how to proceed.

In response, the government argues that trial counsel's failure to consult a handwriting expert was not unreasonable because there is no evidence that he had reason to anticipate that any government witness would testify that the handwriting on the

throughput agreement was Barberio's. The government adds that, in any event, the failure to consult an expert and to rely on the jury's evaluation of the handwriting was a matter of trial tactics, decisions as to which are generally held not to fall within the definition of counsel ineffectiveness. The government contends that under its motion for reciprocal discovery and Fed.R.Crim.P. 16(b) Barberio might have been required to disclose to the government the expert's report on the handwriting and that, accordingly, defense counsel could reasonably have concluded that it was strategically advantageous not to consult an expert so long as he was confident that the jury would see for itself that the handwriting on the throughput agreement was not Barberio's. The government maintains that disclosure of such a report would have been helpful to it even if the expert had concluded that the handwriting was not Barberio's because the report would have alerted the government to refrain from eliciting contrary testimony from Capossela and DeVito.

■ We conclude that Barberio has presented a "plausible" or "viable" claim requiring that a hearing be held to determine whether his attorney's assistance was ineffective. Barberio attests that he advised his trial counsel well before trial that the handwriting on the throughput agreement was not his. Barberio also maintains that trial counsel told him that a handwriting expert was not necessary because it would be obvious to the jury that the handwriting on the throughput agreement did not belong to Barberio when the jurors compared it to the note, Exhibit 31–11C, which was conceded to be in Barberio's handwriting. Indeed, in his opening statement, trial counsel made a point of asking the jury to "look carefully at all the many, many documents that will be introduced, and you look for John Barberio's handwriting ... and I'm going to tell you now ... you will not see his handwriting on documents ..."

In these circumstances, and as the record stands, it appears that trial counsel would have been well-advised to consult a handwriting expert, regardless of whether he had a basis for anticipating the government's trial

plans concerning Capossela's and DeVito's handwriting testimony. Comparison of the handwriting on the throughput agreement with the handwritten note by no means makes the difference in authorship obvious. For example, the handwriting on Exhibit 31–1 is in block letters while that on Exhibit 31–11C is in script. It is not clear simply from examining the exhibits whether the handwriting on them is or is not that of the same person. It is true that in some cases of handwriting comparison identification or non-identification may be obvious, even to the layman. That is not the case here.

The government's contention that there were strategic advantages to be gained from not consulting a handwriting expert in this case is unpersuasive. Under Fed.R.Crim.P. 16(b)(1)(B) Barberio would not have been required to disclose a report by a handwriting expert unless he intended to make use of the expert, or a report by the expert, at trial. Accordingly, no disclosure risk would have attached to an expert's report adverse to Barberio.

The government's further argument that even a favorable expert report could have been a mixed blessing to Barberio is also questionable. It is true that such a report, if delivered to the government because of its proposed use at trial, would have had the disadvantage of alerting the government to refrain from eliciting contrary testimony from its witnesses. However, the benefit of favorable expert testimony might well have outweighed the disadvantage the government points to.

In any event, on the present state of the record we cannot determine whether counsel's failure to consult a handwriting expert was reasonable or unreasonable within the rule of *Strickland.* Barberio has, however, made a plausible showing that upon an evidentiary hearing, the failure to consult an expert may be shown to have been unreasonable.

 ii. *Reasonable probability that the outcome of the trial would have been changed.*

██ Barberio maintains that it is at least plausible that if an expert had testified that the handwriting on the throughput agreement was not Barberio's, the jury would not have convicted him. He argues that the throughput agreement took on special significance at trial because of the importance attached to it by both counsel and the jury. He contends that the effect of expert testimony contradicting DeVito's and Capossela's handwriting testimony would have been to cast doubt on the credibility of their testimony as a whole and would have substantiated Barberio's defense theory that he was being tried for conduct that Capossela, and not Barberio, was guilty of.

The government maintains that the outcome of the trial would not have been different if a handwriting expert had testified on Barberio's behalf because there was "abundant" evidence apart from the throughput agreement tying Barberio to the conspiracy.

There was of course evidence against Barberio other than the handwriting on the throughput agreement, although the government's brief refers to only 24 of the 1375 pages of trial transcript to show this. The evidence established that Barberio had handled Shoreline's purchasing, had arranged for Beck Equities to be a supplier for Shoreline, had handled blank Beck Equities invoices, had changed the prices on them to hide the fact that the gasoline was being purchased below market price and had ordered barges of gasoline from ATI using Conlo's tax exemption license.

Despite such evidence linking Barberio to the tax evasion scheme, we conclude nevertheless, for the reasons given by Barberio, that he has established a plausible claim of a reasonable probability that the jury would have been swayed by expert testimony contradicting Capossela's and DeVito's testimony about the handwriting on the throughput agreement.

The primary reason for our conclusion is the significance attached by both counsel to the handwriting on the throughput agreement throughout the trial. As stated above, defense counsel, in his opening, made a point of asking the jury to "look carefully at all the many, many documents that will be introduced, and you look for John Barberio's

handwriting ... and I'm going to tell you now ... you will not see his handwriting on documents...." The testimony of Capossela and DeVito flatly contradicted this claim and government counsel naturally stressed that contradiction in his rebuttal summation, when he asked rhetorically: "Ms. Devito told you that the handwriting here is that of John Barberio. If John Barberio was not a part of this scheme, what is he doing preparing a throughput agreement in the name of Beck Equities?"

Moreover, the jury's requests for "a read-back of the closing statements of both [counsel] with regard to the handwriting exhibit numbers for John Barberio" and of Joanne DeVito's entire testimony clearly suggest that the subject was important to their considerations.

In sum, we conclude that Barberio "is entitled to an opportunity to show that his trial counsel was ineffective and that absent such ineffective representation, there is a reasonable probability that the result of his trial would have been different." *United States v. Matos,* 905 F.2d at 34. Accordingly, we remand the case for an evidentiary hearing to develop a factual record on the issue of ineffective assistance and retain jurisdiction of this case.

### 2. *Marat Balagula.*

#### a. *District Court's Evidentiary Ruling.*

Balagula's principal argument on appeal is that the District Court erred in admitting testimony by John Quock that Balagula "ha[d] one-hundred percent of New York City sales .... [o]f the bootlegged gas." Balagula argues that admission of this testimony violated the criteria for the use of "other act" evidence under Fed.R.Evid. 404(b). Balagula also contends that the testimony was inadmissible because the District Court failed to engage in a proper balancing test of the probative value of the evidence and its potential prejudice under Fed.R.Evid. 403 and because the testimony was hearsay.

The testimony occurred during a portion of Quock's redirect examination in which the government sought to explore why, as Quock had testified on direct, he had approached Balagula about a source of gasoline supply for the tax evasion scheme:

Q How did you know to go to Mr. Balagula?

[Defense Counsel]: Objection, Your Honor.

THE COURT: I'll allow it.

A Because [at] that time he ha[d] one-hundred percent of New York City sales.

[Defense Counsel]: Objection, Your Honor.

THE COURT: Overruled.

Q One-hundred percent of New York City sales of what?

[Defense Counsel]: Objection.

....

THE COURT: Overruled.

[Defense Counsel]: May we have a side-bar, your Honor?

THE COURT: Sure.

Following a lengthy sidebar discussion, at which defense counsel repeatedly objected that the proposed testimony was not admissible under Fed.R.Evid. 404(b) because Balagula's knowledge and intent were not in dispute, the District Court permitted Quock to answer:

A Of the bootlegged gas.

Immediately thereafter, the trial court instructed the jury that the statement had been "allowed in not to show that [Balagula] is bad or that he was doing bad things. It was only brought in to show knowledge and interest (sic)...." Balagula contends that, despite these instructions, Quock's statement irreparably prejudiced his case because it labeled him as the controller of the entire bootleg gasoline market of New York City and invited the jury to convict him on that improper basis.

We begin by examining Balagula's primary contention that Quock's testimony was improperly admitted under Fed.R.Evid. 404(b) because it was not relevant to an issue in the case. Balagula argues that Quock's testimony was not relevant because he had earlier adequately indicated that his sole defense was that he had not participated in the conspiracy and that accordingly there was no

basis for admission of "other act" testimony under Fed.R.Evid. 404(b). Balagula maintains that his counsel's opening statement and comments during the sidebar about Quock's contested testimony made his position plain. Balagula also places some stock in a letter he wrote to the District Court prior to the start of trial in which he sought to preclude the government from presenting "other act" evidence and in a discussion between counsel and the District Court regarding the use of such evidence immediately prior to trial, both of which are discussed below.

The government disagrees that Balagula ever indicated clearly that his knowledge and intent were not in dispute and maintains that, in any event, Quock's testimony was properly admitted by the District Court under Fed.R.Evid. 404(b) to explain the background of the conspiracy. Moreover, the government contends that defense counsel opened the door to this testimony on his cross examination of Quock by suggesting that someone other than Balagula controlled Hamilton Oil Brokers bootleg operations. Finally, the government argues that even if the District Court erred in admitting Quock's testimony, the error was harmless.

We find that Balagula did not put the Court or the government on notice that his defense eliminated the issues of knowledge and intent from the case and that, accordingly, the District Court did not err in admitting Quock's testimony. We also conclude that, in any event, the testimony's effect was harmless.

■ Fed.R.Evid. 404(b) provides that, although "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith," it may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...." In assessing the admissibility of "other act" evidence, the trial court must, in the first instance, determine whether the evidence is offered for a relevant purpose other than to prove the defendant's bad character. See Huddleston v. United States, 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771

(1988). As the text of the rule indicates, such proper purposes include proof of the defendant's knowledge of or intent to commit the crime of which he is accused. If the evidence is offered for such a purpose, the trial court must then determine whether it is relevant and whether it satisfies the probative-prejudice balancing test of Fed.R.Evid. 403. Finally, if requested to do so, the court must give an appropriate limiting instruction to the jury. See Huddleston, 485 U.S. at 691–92, 108 S.Ct. at 1502; see also United States v. Ortiz, 857 F.2d 900, 903 (2d Cir. 1988), cert. denied, 489 U.S. 1070, 109 S.Ct. 1352, 103 L.Ed.2d 820 (1989).

Of course, evidence is not relevant to an issue in the case if that issue has been removed from the dispute. Accordingly, a defendant may forestall the admission of other act evidence on the issue of intent completely by:

> express[ing] a decision not to dispute that issue with sufficient clarity that the trial court will be justified (a) in sustaining objection to any subsequent cross-examination or jury argument that seeks to raise the issue and (b) in charging the jury that if they find all the other elements established beyond a reasonable doubt, they can resolve the issue against the defendant because it is not disputed.

United States v. Figueroa, 618 F.2d 934, 942 (2d Cir.1980). More recently, we held that a defendant can take an issue, such as intent, out of a case by "mak[ing] some statement to the court of sufficient clarity to indicate that the issue will not be disputed." United States v. Colon, 880 F.2d 650, 659 (2d Cir. 1989).

■ In some circumstances the very nature of a defense put forward by the defendant may itself remove an issue from a case. Where a defendant claims that he did not commit the charged acts, as opposed to claiming that he acted innocently or mistakenly, "[k]nowledge and intent, while technically at issue, [are] not really in dispute." United States v. Benedetto, 571 F.2d 1246, 1249 (2d Cir.1978) (citation omitted). Reaffirming this approach in Ortiz, we stated that "intent is not placed in issue by a defense

that the defendant did not do the charged act at all" and that "[w]hen a defendant unequivocally relies on such a defense, evidence of other acts is not admissible for the purpose of proving intent." *United States v. Ortiz*, 857 F.2d at 904.

■ Thus, the question before us is whether Balagula indicated with sufficient clarity, either by his express statements to the District Court or by the nature of his defense, that he did not dispute the questions of "knowledge" or "intent."

In his opening statement, Balagula's counsel asserted repeatedly that his defense was premised on the question of the credibility of the government's witnesses whom he expected to testify against him. Balagula now argues that "[i]n effect, counsel's opening made it plain that Balagula was contesting his involvement in the Conlo scheme ... and was not resting his defense on lack of 'knowledge' or 'intent'." Balagula maintains that his statement that his case depended on proving the untruthfulness of the witness was sufficient to alert the court and the government that his defense was that he had not committed the charged acts.

Balagula made the same argument to the District Court during the sidebar concerning the admissibility of Quock's testimony. Defending himself against the District Court's position that his cross-examination and opening had made Balagula's knowledge an issue in the case, defense counsel argued:

> [Defense Counsel]: Your Honor, quite to the contrary, my opening was an attack on the credibility on (sic) Mr. Quock and Mr. Byrne.
>
> THE COURT: That's all.
>
> [Defense Counsel]: That's it. Absolutely, I was very careful about that. I think the record will support that.
>
> THE COURT: You are not questioning—just the credibility.
>
> [Defense Counsel]: What these witnesses are saying quite clearly is that my client [Balagula] was behind all this. Now if they are telling the truth, then he must have known what he was doing, it just doesn't make sense [otherwise].

Later in the sidebar, defense counsel asserted that "I know [the government] has to prove intent and knowledge, but, if the jury believes Mr. Quock then [the government] has proved [its] case."

Because the trial court is in the best position to evaluate the admissibility of evidence, it is accorded broad discretion and its ruling will not be overturned on appeal absent a clear showing of abuse of discretion. *United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992). We find no abuse of discretion in the district court's decision to admit the testimony. A statement to the jury that the government's witnesses will be shown to be untruthful is simply not a sufficient commitment that the defendant removes the issue of knowledge or intent from the case. We emphatically disagree with Balagula's theory that a defense depending exclusively on attacking the credibility of the government's witnesses is the functional equivalent of a defense that the defendant did not commit the charged acts. An attack on the credibility of the government's witnesses is essentially a claim that the government has not met its burden of proof, a proposition quite different from either a claim of innocence or a concession that the government need not prove the defendant's knowledge and intent.

Balagula argues that it would have been "ludicrous" for the jury to believe that Balagula had participated in the tax evasion scheme, but had done so innocently or unwittingly, and that therefore, at least in the instant case, a challenge to the witnesses' credibility was equivalent to a claim that the defendant did not commit the charged acts. However, the issue before us is not what the jury might or might not have believed but rather whether the defendant gave sufficiently clear notice to the Court and the government that he was not contesting the issues of knowledge and intent.

Balagula's reliance on cases in which we have held that the defendant did indicate with sufficient clarity that he did not dispute the questions of knowledge or intent is misplaced. *See United States v. Colon*, 880 F.2d at 656–62; *United States v. Figueroa*, 618 F.2d at 939–44; *United States v. Mohel*, 604 F.2d 748, 753–55 (2d Cir.1979); *United*

States v. Manafzadeh, 592 F.2d 81, 86–89 (2d Cir.1979); United States v. O'Connor, 580 F.2d 38, 40–43 (2d Cir.1978). None of these cases can be read to support Balagula's contention that a defense depending exclusively on attacking the credibility of the government's witnesses is sufficient notice that the issue of knowledge and intent will not be disputed. Although in Mohel this Court found that the defendant's challenge to the credibility of the government's witness was an indication of counsel's effort to remove the issues of knowledge and intent, the outcome of the case depended on defendant's repeated unequivocal offers to stipulate to these issues. United States v. Mohel, 604 F.2d at 752–53. Similarly, although we stated in Figueroa that the case against one of the defendants rested on the credibility of one of the government's witnesses, it was not the challenge to the credibility of that witness, but rather the defendant's clear statements that he was not disputing the issue of intent that determined the outcome there. United States v. Figueroa, 618 F.2d at 939–44.

Nor are we persuaded by Balagula's additional contentions that his letter of June 18, 1992 to the District Court or the discussion with the trial court regarding the admissibility of 404(b) evidence immediately prior to trial gave a sufficient indication of his willingness to concede these issues. The letter simply stated that some of the government's possible evidence concerned matters unrelated to the acts charged in the indictment and that defense counsel "fully expected" that the government would not be able to justify its admission under Fed.R.Evid. 404(b) to prove issues such as knowledge, intent, absence of mistake or plan. Although the letter also stated that the evidence should at least be excluded "until the Court learns about the nature of the government's evidence and the defense theory of the defendant against whom the 404(b) evidence is offered," it did not specify either the nature of his defense or that Balagula was willing to concede any issue in the case.

Defense counsel repeated his objection to the "404(b) type evidence" immediately prior to trial, stating that he didn't "believe that it [was] going to be relevant to any issue con-

tested at trial" and that "[o]bviously it should be kept out of the government's opening, direct case, at a minimum." The District Court then directed the government "not to bring [404(b) evidence] in until we have a clear knowledge of what the defense claims." This prophylactic instruction by the District Court regarding the government's use of 404(b) evidence, although not by itself determinative of our conclusion, supports our finding that Balagula had not at that time informed Court and counsel that he did not dispute knowledge and intent.

Balagula's remaining arguments against the admissibility of Quock's testimony are no more persuasive. Balagula has waived his argument that Quock's testimony was inadmissible hearsay because he failed to raise that objection at trial. Moreover, it is arguable that the testimony was not hearsay as a matter of law, since it was offered only to explain why Quock had contacted Balagula and not for the proposition that Balagula controlled the bootleg gasoline market.

■ Finally, even if it were concluded that the District Court erred in admitting Quock's testimony, its admission was harmless error.

Balagula argues that the admission of Quock's testimony was not harmless primarily because it raised the "unmistakable implication" that Balagula was "master of the entire bootleg market, rather than merely a participant in a limited scheme lasting several months and involving a defined tax loss of $400,000." He also argues that the prejudice to him was exacerbated by the government's reference to the testimony in summation as evidence of Balagula's guilt.

The government replies that the District Court's instruction to the jury that the testimony at issue was "allowed in not to show that [Balagula] is bad or that he was doing bad things" ensured that the statement would not improperly influence the jury and that, in any event, there was overwhelming evidence of Balagula's guilt apart from Quock's disputed testimony.

In determining whether an error was harmless, an appellate court must look at "what effect the error had or reasonably may be taken to have had upon the jury's deci-

sion." *Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946). "An erroneous ruling on the admissibility of evidence is harmless if the appellate court can conclude with fair assurance that the evidence did not substantially influence the jury." *United States v. Rea,* 958 F.2d 1206, 1220 (2d Cir.1992).·

There was indeed significant testimony in this case showing Balagula's participation in the gasoline excise tax evasion scheme. However, it is not the bulk of evidence against Balagula, but the content of three particular statements by Quock at earlier points in the trial that persuades us that the admission of the disputed testimony was harmless error. Quock had already testified that Balagula "was selling about 10 million gallons in the City ...," and that "[t]he whole volume for the City was 10 million with Marat [Balagula] at that time." ·Quock also testified that when he had been involved in bootlegging prior to the spring of 1985, he was buying gasoline from Balagula. This earlier testimony certainly minimized if it did not indeed eliminate the impact of Quock's later testimony that Balagula "ha[d] one-hundred percent of New York City sales .... ·of the bootlegged gas." The jury already knew that Balagula was selling large quantities of gasoline in New York City and that he was involved with bootlegging.

The same observations apply to the government's references to Quock's disputed testimony in its summation and rebuttal. Since the jury was already essentially familiar with Balagula's bootlegging activities from the earlier testimony described above, the ·government's references to the disputed testimony in its closing certainly would have had a minimal influence.

b. *Improper Enhancement of Sentence.*

■ Balagula contends that his ten year sentence, which is to run consecutively to an eight year term he is presently serving, "fails to satisfy the principle that 'justice must satisfy the appearance of justice.'" *United States v. Edwardo–Franco,* 885 F.2d 1002, 1005 (2d Cir.1989) (quoting *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954)). This argument is based on the. District Court's admonition to Balagula prior to imposing sentence that:·

> You came here in 1977. Your first conviction was in 1985. Your second federal conviction was in 1986. You've cost this government more money, more aggravation. This was supposed to be a haven for you; it turned out to be a hell for us.

Balagula asserts that the quoted statement demonstrates that the District Court "plainly focused on Balagula's foreign national origin in explaining the basis for the severity of his punishment—a consideration that impermissively (sic) conflicts with·Balagula's due process rights in the sentencing process." He maintains that the District Court's distinction between "you" and "us" appeared to send a message that immigrants who commit crimes should be punished more severely than American-born offenders. Balagula also points out that the sentence imposed on him exceeded the recommendation made in the pre-sentence report by five to six years, even though that report contained a number of allegations adverse to Balagula which were subsequently stricken. Finally, Balagula emphasizes that the sentence imposed on him was twice as long as the most severe sentence previously imposed in the "bootleg gasoline" cases.

The government counters that, viewed in the context of the evidence introduced at the sentencing hearing, it is clear that the District Court's concern was not the defendant's immigrant status, but his previous convictions and his criminal associations.

We find that the sentence imposed on Balagula satisfies the principle that "justice must ·satisfy the· appearance of justice." The government produced evidence at sentencing that Balagula was a member of·an organized crime ·family, that he was extensively involved ·in bootlegging gasoline, that he had been previously convicted for a debit card fraud scheme in Pennsylvania and that, after conviction and prior to sentencing there, Balagula had been a fugitive for more than two years and had used numerous false names and passports. The evidence also established that, while a fugitive, Balagula received $50,000 a month from his New York business entities including his bootleg gaso-

line operation. Such a record amply supported Balagula's sentence and even the defendant does not argue that the District Court had no authority to impose the sentence.

The District Court's statement in this case about which Balagula complains is simply not comparable to the Court's remarks in *Edwardo–Franco*, 885 F.2d at 1005, on which Balagula relies. In *Edwardo–Franco*, the sentencing judge stated:

> They [Colombians] don't have too much regard for Judges. They only killed 32 Chief Judges in that nation. Their regard for the judicial system, the men who run their laws, I'm glad I'm in America. That's why I pledge allegiance to the flag. My mother and father came from Italy.
>
> . . . .
>
> Nobody told them to come here. I'm one of the fellows who makes United States citizens. Nobody tells them to come and get involved in cocaine. Don't give me that theory.

*Edwardo–Franco*, 885 F.2d at 1005.

In light of the substantial evidence of other wrongdoing adduced at sentencing, we find no impropriety in the sentence imposed by the District Court.

## CONCLUSION

For these reasons, we remand Barberio's case for an evidentiary hearing to develop a factual record on the issue of ineffective assistance and retain jurisdiction of his case. Balagula's conviction and his sentence are affirmed.