UNITED STATES of America, Appellee,

v.

John DOE, Defendant–Appellant,

James Roe, Defendant.

No. 95–8010.

United States Court of Appeals,
Second Circuit.

Aug. 9, 1995.

Before: VAN GRAAFEILAND, WALKER, and CABRANES, Circuit Judges.

WALKER, Circuit Judge:

Defendant John Doe ("Doe") appeals from a judgment of conviction following a jury trial in the Southern District of New York. Doe was convicted on all counts of the indictment and was sentenced to a lengthy prison term.

On appeal, Doe attacks both his conviction and sentence. First, he contends that the district court erred in failing to determine, after an evidentiary hearing, whether the government breached its cooperation agreement with him and whether he was thereby entitled to dismissal of the indictment. Second, he argues that the district court misapplied the law in denying his pretrial motions for closure of preliminary proceedings and the trial. Doe sought closure out of fear of retribution from his criminal associates for his work as a confidential government informant. Doe contends that the district court's decision impaired his constitutional right to defend against the charges since he could not raise his public authority defense without jeopardizing his safety and that of his family. Third, Doe argues that, if the conviction is upheld, the district court erred in not adjusting his offense level downward for acceptance of responsibility.

## BACKGROUND

A full opinion in this case was filed under seal. Because of the defendant's interest in confidentiality, any references which would serve to identify the defendant have been expunged from this published version of the opinion. Our description of the facts is therefore necessarily terse.

Defendant John Doe was arrested after he participated in a controlled criminal transaction under government surveillance. Before trial, Doe moved to close pretrial hearings and seal motion papers, and subsequently moved to close the trial. Doe, who had infiltrated an international criminal syndicate as a government informant, alleged that he feared retaliation against himself and his family if his informant activities were re-

vealed. After the district court decided to hold open pretrial hearings, Doe withdrew his motion to suppress statements given to federal agents. At trial, Doe rested without presenting any evidence and was convicted.

Doe detailed his activities as an informant in a sealed affidavit that he submitted to support his pretrial motion to seal papers and close pretrial hearings. According to the affidavit, Doe voluntarily contacted federal law enforcement authorities about a year before his arrest. He spoke to Agent David Smith and volunteered that he had information about an organization that laundered millions of dollars per week in criminal proceeds. Doe, an illegal alien, told Agent Smith that he was coming forward because he needed help with immigration problems and also hoped to become a federal agent. Agent Smith convinced him instead to become a confidential informant. They agreed that Doe would take part in the money-laundering activities of the organization and would be allowed to keep any money the organization paid him. Agent Smith assured Doe that doing so would not be a crime since he would be working for the government.

Over the next few months Doe contacted Agent Smith or another federal agent every day or two with information on the syndicate. He provided the agents with names, telephone and beeper numbers, and photographs of the members of the organization. Doe and Agent Smith also taped conversations Doe had with some of those persons. At some point during that period, Doe signed what he understood, through his interpreter, to be a cooperation agreement with the agents. In return, he received a stipend and a promise of payment of one to three percent of any money seized from the laundering operation.

Later that year, Doe told Agent Smith that he had information about other criminal activities of the organization. The agent urged him to collect whatever information he could but warned him to avoid as much as possible participating in the other criminal activities. According to the affidavit, Agent Smith nonetheless agreed that Doe would have to "do some work" so that he could gather good information.

Doe informed Agent Smith every time his "bosses" in the organization ordered him to participate in a criminal transaction. Unable to decline their invitations without arousing suspicion, Doe participated in one such transaction, but turned the contraband over to Agent Smith. Doe fabricated a story about the fate of the contraband, and was interrogated at length by his suspicious bosses. The bosses came to believe that the persons they sent to retrieve the contraband had stolen it. In all, more than ten persons were killed in retribution, and the bosses were hunting for yet another man suspected of involvement in the caper. Doe told Agent Smith about all of these killings.

Agent Smith then instructed Doe to, in Doe's words, "work only with money and limit [his other] work to the collection of information." Doe requested that his bosses assign him only money-laundering tasks, but his bosses told him that he would have to do at least some more dangerous and less desirable assignments.

At one point, Doe informed Agent Smith about a killing in another country. Two law-enforcement agents from that country then came to New York and questioned Doe about what he knew. On two other occasions, Doe alerted Agent Smith to imminent criminal transactions.

Some time later Doe participated in the transaction that formed the basis of his conviction. According to his affidavit, Doe paged Agent Smith, inserting the code "911" to signal him to respond immediately since Doe was in the middle of criminal activity. Shortly thereafter, the federal agents arrived and arrested Doe. When he was alone with the agents, Doe advised them that he was an informant. One agent asked him whether he was the person who worked with Agent Smith. Doe replied that he would speak only to Agent Smith. When one agent identified himself as Agent Smith's supervisor, Doe told him that he had paged Agent Smith about the transaction before the agents arrived. The agents contacted Agent Smith, who confirmed Doe's earlier communication.

Following his arrest and indictment, Doe, his attorneys, and his family abroad received

repeated requests from unidentified persons for copies of motion papers, tapes, and discovery items received from the government. To avoid disclosing his informant activities, Doe instructed his attorneys to draft sanitized versions of the motions with all mention of his informant activities expunged so that he could send them to his family for distribution.

In a sealed opinion and order the district court, while noting that Doe's "perceived danger to his family causes concern," denied the motion to seal the papers and close pretrial hearings. The district court apparently did not request a response to Doe's affidavit from the government and did not hold a hearing on any fact issues raised in the affidavit. In denying the motion, the district court reasoned that Doe's past cooperation would "inevitably be made public at his trial," which would itself be public given the government's refusal to consent to a trial *in camera* and without a jury. In the district court's view, disclosure of Doe's status as a confidential informant "sooner than if it [were] revealed for the first time at trial" did "not constitute 'an overriding interest that is likely to be prejudiced.'" While denying Doe's motion, the district court did order the following safeguards:

(1) [Codefendant] and his lawyer are directed not to communicate with anyone concerning the contents of the [Doe] motion papers without first informing the Court of the proposed communication.

(2) The Government is directed immediately to inform the Bureau of Prisons and the United States Marshal Service of the possible danger to [Doe], and that [Doe] be kept safe and segregated from the general prison population while in custody.

(3) [Doe], under Government monitoring and in the presence of his lawyer, may call his family ..., at Government expense, to advise them of the possible danger to themselves, so that they may take appropriate steps to safeguard themselves.

At a scheduling conference held on the same day, Doe informed the district court that, in light of its decision, he would withdraw his motion for severance and forego his public authority defense rather than risk exposure of his informant status. At a conference held five days later, Doe sought a stay of the hearings so that he could file an interlocutory appeal of the district court's order to minimize the possibility that he or his family would be "murdered" in retribution for his informant activities.[1] The district court rebuked Doe's counsel for intimating on the record that specific death threats had been uttered indicating a likelihood of murder. The district court noted that it had "directed specifically that the government take extreme and very careful steps to insure [Doe's] protection," and that the federal prison system was adept at keeping cooperating witnesses secure. The district judge added, "I indicated in my decision, which is sealed, that I to a degree shared your concern [about safety]," and "I don't minimize ... [Doe's] welfare, and I certainly don't minimize his family's welfare." Nonetheless, the district judge concluded, "I set forth the only appropriate steps available to me in accord with a public trial that I was aware of that could be taken."

After Doe's codefendant pled guilty, thereby removing the risk that the codefendant would divulge Doe's testimony to the syndicate, Doe decided that he could safely raise his public authority defense if the trial were closed. Doe then moved that the trial be closed for the presentation of that defense and the defense summation. The government objected that "[i]n effect, the entire trial would have to be sealed," since several of its witnesses would need to testify concerning that defense, and the government intended to address the public authority defense, if put forth, both during its opening statement and summation. The district court agreed, stating that it was "not aware of any authority given the present posture of this case requiring that the courtroom be closed or that the record be sealed." Moreover, it noted that secret trials are contrary to the American tradition and injurious to

---

1. We denied a motion to stay the district court's proceedings pending resolution of the appeal. The interlocutory appeal was later withdrawn by consent without prejudice so that this appeal might be filed.

the judicial process. Accordingly, the district court denied the motion to close the trial and seal the record. The trial proceeded the next day, and concluded in the government's favor without the defense's presenting any evidence.

## DISCUSSION

I. Dismissal of the Indictment

We can quickly dispose of Doe's claim that he was entitled to a pretrial hearing as to whether the indictment should be dismissed on the grounds that the government breached its cooperation agreement with him.

■■■■ A defendant is only entitled to raise in pretrial motions a "defense, objection, or request which is capable of determination without the trial of the general issue." Fed. R.Crim.P. 12(b). The general issue in a criminal trial is, of course, whether the defendant is guilty of the offense charged. *See United States v. Yater,* 756 F.2d 1058, 1062 (5th Cir.), *cert. denied,* 474 U.S. 901, 106 S.Ct. 225, 88 L.Ed.2d 226 (1985). The motion based upon the alleged breach of a cooperation agreement was properly dismissed since it was, in essence, an assertion that as a confidential informant Doe acted with public authority in participating in criminal transactions. A claim of public authority is an affirmative defense that is tried to the jury, *United States v. Burrows,* 36 F.3d 875, 881 (9th Cir.1994) (citing *United States v. Baptista–Rodriguez,* 17 F.3d 1354, 1368 n. 18 (11th Cir.1994)), provided the accused has met the procedural requirements for raising that defense at trial. *See* Fed.R.Crim.P. 12.3. A defendant is not entitled to raise in a pretrial motion the question whether the government breached an agreement with him if the agreement provides a defense to liability for the crimes charged in the indictment; resolution of that question requires trial of the general issue and is not properly decided in a pretrial motion. *Cf. United States v. Knox,* 396 U.S. 77, 83 & n. 7, 90 S.Ct. 363, 367 & n. 7, 24 L.Ed.2d 275 (1969) (noting that defense sounding in duress requires trial of the general issue).

The cases cited by Doe, in which courts have considered whether the government's alleged breach of a cooperation agreement warranted dismissal of the indictment, are inapposite; they all involved breaches of plea bargains and agreements granting the defendant immunity for past criminal conduct. *See United States v. Alessi,* 536 F.2d 978, 979 (2d Cir.1976), *overruled on other grounds, United States v. Macchia,* 41 F.3d 35, 39 (2d Cir.1994); *see also United States v. Johnson,* 861 F.2d 510, 512–13 (8th Cir.1988); *United States v. Gianakakis,* 671 F.Supp. 64, 69–72 (D.Me.1987); *United States v. Paiva,* 294 F.Supp. 742, 748 (D.D.C.1969). The issue of breach in those cases, unlike this one, did not pertain to the defendant's guilt and could be determined without trial of the general issue. *Cf.* Fed.R.Crim.P. 12, 1944 Advisory Committee Note (discussing objections and defenses that may or must be raised pretrial). Therefore, the district court correctly denied Doe's motion to dismiss the indictment.

II. Closure of Pretrial Hearings and Trial

■■■ In reviewing the district court's denial of Doe's closure motions, we examine the district court's findings of fact for clear error, its legal determinations *de novo,* and its ultimate decision to deny or grant a motion for closure for abuse of discretion, *United States v. Lucas,* 932 F.2d 1210, 1217 (8th Cir.1991), *cert. denied,* 502 U.S. 869, 929, 949, 991, 1100, 112 S.Ct. 199, 349, 399, 609, 1186, 116 L.Ed.2d 159, 288, 348, 632, 117 L.Ed.2d 429 (1991–92). However, because the district court's discretion is significantly circumscribed by constitutional principles set forth by the Supreme Court, this court's review "is more rigorous than would be the case in other situations in which abuse-of-discretion review is conducted." *United States v. Local 1804–1, Int'l Longshoremen's Ass'n,* 44 F.3d 1091, 1096 (2d Cir.1995) (describing standard for civil contempt proceedings); *Morgan v. Foretich,* 528 A.2d 425, 427 n. 3 (D.C.1987) (describing the standard for reviewing closure motions).

### A. *Legal Standard*

The tradition of the public trial has roots deep in English history, originating in the Anglo–Saxon moots, *see Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 565, 100

S.Ct. 2814, 2821, 65 L.Ed.2d 973 (1980) (plurality opinion); *Gannett Co. v. DePasquale,* 443 U.S. 368, 419, 99 S.Ct. 2898, 2925, 61 L.Ed.2d 608 (1979) (Blackmun, J., concurring in part and dissenting in part), and continuing unbroken in this nation from the colonial period to the present day, *see Richmond Newspapers,* 448 U.S. at 567–69, 100 S.Ct. at 2822–23. Celebrated by Hale, Blackstone, and Bentham, openness has come to be seen as "an indispensable attribute of an Anglo–American trial," which assures the accused a fair trial and "discourage[s] perjury, the misconduct of participants, and decisions based on secret bias or partiality." *Id.* at 569, 100 S.Ct. at 2823.

Beyond enhancing the fairness of the trial itself, openness has broader value in the general administration of justice. "[T]he sure knowledge that anyone is free to attend gives assurance that established procedures are being followed and that deviations will become known," *Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 508, 104 S.Ct. 819, 823, 78 L.Ed.2d 629 (1984) (*"Press–Enterprise I"*) (emphasis omitted), thereby contributing to the public's perception of fairness in the criminal justice system and "heightening public respect for the judicial process." *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 606, 102 S.Ct. 2613, 2620, 73 L.Ed.2d 248 (1982). Free access of the press and public to criminal proceedings informs the populace of the workings of government and fosters more robust democratic debate. *Id.* at 604–05, 102 S.Ct. at 2618–19. Finally, open trials serve a therapeutic function for the community, providing an outlet for public outrage at crimes and "vindicat[ing] the concerns of the victims and the community in knowing that offenders are being brought to account for their criminal conduct by jurors fairly and openly selected." *Press–Enterprise I,* 464 U.S. at 509, 104 S.Ct. at 823.

The open trial, however, has at times proven to be a two-edged sword for defendants, many of whom have felt the cut of prejudicial publicity. The conflict between public access to criminal proceedings and a defendant's right to a fair trial is "as old as the Republic." *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 547, 96 S.Ct. 2791, 2797, 49 L.Ed.2d 683 (1976) (discussing problem of ensuring an unbiased jury). In *Gannett,* 443 U.S. at 379–81, 99 S.Ct. at 2905–06, the Supreme Court, striking the balance in favor of the criminal defendant, determined that the Sixth Amendment guarantee of a public trial was personal to the accused and did not grant the press and general public an independent right of access, at least to pretrial suppression hearings.

In later cases, however, the Court reached the question reserved in *Gannett, id.* at 392–93, 99 S.Ct. at 2911–12, whether the First Amendment (or, via incorporation, the Fourteenth Amendment) is an independent source of a right to access to criminal proceedings. The Court has clarified that the press and public have a "qualified right of access" under the First and Fourteenth Amendments to at least some criminal proceedings. *Waller v. Georgia,* 467 U.S. 39, 44–45, 104 S.Ct. 2210, 2214, 81 L.Ed.2d 31 (1984). That right was first recognized with regard to the actual trial, *see Richmond Newspapers,* 448 U.S. at 580, 100 S.Ct. at 2829 (plurality opinion of Burger, C.J.), at 585, 100 S.Ct. at 2831 (Brennan, J., concurring in the judgment), at 599, 100 S.Ct. at 2839 (Stewart, J., concurring in the judgment), at 604, 100 S.Ct. at 2842 (Blackmun, J., concurring in the judgment); *Globe Newspaper,* 457 U.S. at 603–04, 102 S.Ct. at 2618, including the selection of jurors, *Press–Enterprise I,* 464 U.S. at 508–510, 104 S.Ct. at 823–24, and later in regard to certain pretrial proceedings, *see Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 8–10, 106 S.Ct. 2735, 2740–41, 92 L.Ed.2d 1 (1986) *"Press–Enterprise II")* (In determining whether a public right of access attaches to a proceeding, courts consider whether the proceeding has historically been open and whether "public access plays a significant positive role in the functioning of the particular process in question.") (finding that the right attaches to preliminary hearings under California law). *See also United States v. Haller,* 837 F.2d 84, 87 (2d Cir.1988) (right of access attaches to plea hearings and related documents); *In re New York Times Co.,* 828 F.2d 110, 116 (2d Cir.1987) (*"In re New York Times I"*) (motion papers submitted for suppression hearing), *cert. denied,* 485 U.S. 977,

108 S.Ct. 1272, 99 L.Ed.2d 483 (1988), *opinion after remand,* 834 F.2d 1152 (2d Cir. 1987) (per curiam) (*"In re New York Times II"*), *cert. denied,* 485 U.S. 977, 108 S.Ct. 1272, 99 L.Ed.2d 483 (1988); *In re Herald Co.,* 734 F.2d 93, 99–101 (2d Cir.1984) (suppression hearing).

Because the right of access to criminal proceedings is not absolute, it "may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Waller,* 467 U.S. at 45, 104 S.Ct. at 2215. Given the presumption of openness, *Press–Enterprise I,* 464 U.S. at 510, 104 S.Ct. at 824, "proceedings cannot be closed unless specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Press–Enterprise II,* 478 U.S. at 13–14, 106 S.Ct. at 2742–43 (quoting *id.*). Addressing a defendant's claim that his right to a fair trial would be compromised if a preliminary hearing were opened to the public, the Supreme Court in *Press–Enterprise II* formulated the following balancing test for determining whether closure is appropriate:

> If the interest asserted is the right of the accused to a fair trial, the preliminary hearing shall be closed only if specific findings are made demonstrating that, first, there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent and, second, reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights.

478 U.S. at 14, 106 S.Ct. at 2743.

In *In re Herald,* a case decided prior to *Press–Enterprise II,* we announced a substantially similar test, although its application extended to cases in which more than a fair trial was at stake. We recognized that a person's physical safety, among other things, could in certain instances justify a closure order.[2] *In re Herald,* 734 F.2d at 100. We held that closure

> should be invoked only upon a showing of a significant risk of prejudice to the defendant's right to a fair trial or of danger to persons, property, or the integrity of significant activities entitled to confidentiality, such as ongoing undercover investigations or detection devices. Though we do not believe that closure must be found to be the least restrictive means possible to avoid the perceived risk, the trial judge must consider alternatives and reach a reasoned conclusion that closure is a preferable course to follow to safeguard the interests at issue.

*Id.* (citations omitted).

It is worthwhile for us to restate the broader test of *In re Herald,* which is applicable here, in the language used by the Supreme Court in *Press–Enterprise II.* Moreover, the test should account for the recognition by the Supreme Court and this court that, in addition to the interests noted in *In re Herald,* the privacy interests of individuals may also warrant closure orders in certain circumstances. *See Globe Newspaper,* 457 U.S. at 607–608, 102 S.Ct. at 2620–21 (physical and psychological welfare of minor victims of sex crimes); *Haller,* 837 F.2d at 88 (privacy interests of labor organization officers and employees investigated but not indicted by grand jury); *In re New York Times II,* 834 F.2d at 1154 (privacy interests of third parties whose conversations are intercepted by electronic surveillance).

---

**2.** Prior to *In re Herald,* we had found at least partial closure to be necessary to prevent exposure of testimony that might provoke retaliation against witnesses or defendants. In *United States v. Arroyo–Angulo,* 580 F.2d 1137, 1141–42 (2d Cir.1978), *cert. denied,* 439 U.S. 913, 1005, 1131, 99 S.Ct. 285, 618, 1502, 58 L.Ed.2d 260, 681, 93 (1978–79), for example, we held that *in camera* proceedings did not violate defendants' Sixth Amendment right to a public trial. We found that closure was necessary to protect the safety of codefendants by keeping their cooperation agreement with the government secret. *See also United States ex rel. Lloyd v. Vincent,* 520 F.2d 1272, 1274–75 (2d Cir.) (upholding closure of trial during testimony of undercover narcotics agent to "preserve his future usefulness[] and safeguard[] his life"), *cert. denied,* 423 U.S. 937, 96 S.Ct. 296, 46 L.Ed.2d 269 (1975); *United States ex. rel. Bruno v. Herold,* 408 F.2d 125, 127–29 (2d Cir.1969) (upholding closure of trial for part of one day to prevent witness intimidation), *cert. denied,* 397 U.S. 957, 90 S.Ct. 947, 25 L.Ed.2d 141 (1970).

■ There are four steps that a district court must follow in deciding a motion for closure. First, the district court must determine, in specific findings made on the record, if there is a substantial probability of prejudice to a compelling interest[3] of the defendant, government, or third party, see *Press–Enterprise II*, 478 U.S. at 9 n. 2, 13–14, 106 S.Ct. at 2741 n. 2, 2742–43, which closure would prevent, *id.* at 14, 106 S.Ct. at 2743. Compelling interests may include the defendant's right to a fair trial, *In re Herald*, 734 F.2d at 100; privacy interests of the defendant, victims or other persons, *Globe Newspaper*, 457 U.S. at 607, 102 S.Ct. at 2620; *Haller*, 837 F.2d at 88; *In re New York Times II*, 834 F.2d at 1154; "the integrity of significant [government] activities entitled to confidentiality, such as ongoing undercover investigations or detection devices," *In re Herald*, 734 F.2d at 100; and danger to persons or property, *id.; see also United States v. Raffoul*, 826 F.2d 218, 226 (3d Cir. 1987). Second, if a substantial probability of prejudice is found, the district court must consider whether "reasonable alternatives to closure cannot adequately protect" the compelling interest that would be prejudiced by public access. *Press–Enterprise II*, 478 U.S. at 14, 106 S.Ct. at 2743. Third, if such alternatives are found wanting, the district court should determine whether, under the circumstances of the case, the prejudice to the compelling interest "override[s] the qualified First Amendment right of access," *id.* at 9, 106 S.Ct. at 2741. Fourth, if the court finds that closure is warranted, it should devise a closure order that, while not necessarily the least restrictive means available to protect the endangered interest, *In re Herald*, 734 F.2d at 100, is narrowly tailored to that purpose, *Press–Enterprise I*, 464 U.S. at 510, 104 S.Ct. at 824; *Globe Newspaper*, 457 U.S. at 606–07, 102 S.Ct. at 2619–20.

Doe claims that the district court applied the wrong legal standard in adjudicating his closure motions. In deciding Doe's pretrial closure motions, the district court quoted the Supreme Court's holding in *Waller v. Georgia, supra,* that a defendant seeking closure must " 'advance an overriding interest that is likely to be prejudiced' " if closure is denied, and must show that the closure is " 'no broader than necessary to protect that interest.' " *See Waller,* 467 U.S. at 48, 104 S.Ct. at 2216. Doe faults the district court for applying a test that the Supreme Court invoked for determining when a closure order imposed over the defendant's objection violates the defendant's Sixth Amendment right to a public trial, *see* 467 U.S. at 40–41, 104 S.Ct. at 2212, rather than the test applicable when the defendant waives that right and requests a closed trial.

■ The district court did not apply the wrong standard. The same test applies whether a closure motion is made by the government over the defendant's Sixth Amendment objection or made by the defendant over the First Amendment objection of the government or press. *Waller,* 467 U.S. at 47, 104 S.Ct. at 2216 ("In sum, we hold that under the Sixth Amendment any closure of a suppression hearing over the objections of the accused must meet the tests set out in *Press–Enterprise [I]* and its predecessors."). The "substantial probability" of prejudice language in *Press–Enterprise II* represents a refinement of, not a departure from, the *Waller* and *Press–Enterprise I* standards. If a defendant objects to closure under the Sixth Amendment, that may affect the interests that the district court must balance. *Cf. Waller,* 467 U.S. at 47 n. 6, 104 S.Ct. at 2216 n. 6 ("One of the reasons often advanced for closing a trial—avoiding tainting of the jury by pretrial publicity—is largely absent when a defendant makes an informed decision to object to the closing of the proceeding." (citation omitted)). Nevertheless, the same standard applies whether the defendant is seeking or objecting to closure. The district

---

**3.** The Supreme Court has used an array of terms to describe the type of interest that a party must advance in order to justify closure of a criminal proceeding. The Court has at different times held that the interest advanced must be "compelling," *Globe Newspaper,* 457 U.S. at 607, 102 S.Ct. at 2620, "overriding," *Waller,* 467 U.S. at 48, 104 S.Ct. at 2216, or a "higher value[ ]," *Press–Enterprise I,* 464 U.S. at 510, 104 S.Ct. at 824, without apparently intending substantive distinctions among the terms. We will use the term "compelling interest" throughout this opinion for the sake of consistency.

court essentially applied the standard that we have clarified from precedent above.

In denying Doe's subsequent motion to close part of the trial—namely, his testimony, the defense summation, and the jury charge—the district court did not state what standard it applied. There is nothing in the record to indicate that it did not apply the same standard it used in denying the pretrial motions. Therefore, we assume that the district court applied the *Waller* standard in deciding not to close the trial. The use of that standard was not erroneous, despite our holding in *Woods v. Kuhlmann,* 977 F.2d 74, 76 (2d Cir.1992), that a party seeking partial closure of a proceeding need only advance a "substantial reason" rather than an "overriding interest."

The closure involved in *Woods* was minimal. In that case, to allay a government witness's fear of retaliation, the trial court excluded only members of defendant's family from the courtroom and only for the duration of the witness's testimony. *Id.* In reviewing that closure order, we adopted the "substantial reason" test out of concern that the "overriding interest" standard required under *Waller* to justify total closure of a proceeding was too stringent when only partial closure of the proceeding was at issue. *Id.*

■ We do not read *Woods* to require the same showing of prejudice whenever a party seeks an order short of total closure. The burden on the movant to show prejudice increases the more extensive the closure sought. When limited closure comparable to that in *Woods* is at issue, the prejudice asserted need only supply a "substantial reason" for closure. When the closure sought is total or nearly so, the district court must find the prejudice to be "overriding." The partial closure sought by Doe was far more extensive than that in *Woods*. The district court found that closure would have to extend to at least the opening statements, the testimony of certain government witnesses and the defendant, the summations, and the jury charge—effectively the whole of the trial. Under these circumstances, the defendant must make a higher showing of prejudice to justify closure than was necessary in *Woods;* the defendant must show that prejudice to

the compelling interest overrides the qualified First Amendment right of access, as required under *Waller* and the third prong of the general closure standard set forth above.

Accordingly, we hold that the district court did not apply an erroneous standard in deciding the motions for closure of both the pretrial hearings and the trial. We turn now to the district court's application of the law in denying Doe's closure motions.

### B. *Denial of the Closure Motions*

As stated above, we reject Doe's contention that the district court should have applied to his closure motions a standard more lenient than the stringent one set forth in *Press–Enterprise II* and *Waller v. Georgia.* The district court brought the proper standard to bear on Doe's requests for closure; the question is whether the court abused its discretion in applying these standards en route to its denial of Doe's motions.

The district court did not explicitly address the question of substantial probability of danger to Doe. Nonetheless, the record shows that the court did advert to the possibility that Doe and his family might face retribution from the criminal syndicate. In its written order, in response to Doe's request for closure of pretrial hearings, the district court ordered that certain safeguards be taken to protect Doe and his family. Further, the district judge stated to Doe that "[he] to a degree shared [Doe's] concern" about safety, and that he did not want to "minimize [Doe's] welfare ... [or] minimize his family's welfare." At the same time, however, the district court noted in several places that Doe had not alleged any direct threat, and appeared to give some weight to the absence of any such threat.

The government contends that Doe's showing of risk to the safety of his family or himself was necessarily insufficient because he did not allege that he or his family had received direct threats and did not provide any corroborating evidence, such as newspaper articles, that the syndicate had committed the slayings he said had occurred. The district court, however, did not so hold, nor do we. To be sure, where closure motions

are at issue, the record must support an inference of a substantial probability of danger, *see Vidal v. Williams*, 31 F.3d 67, 69 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 778, 130 L.Ed.2d 672 (1995), and the stringent "substantial probability" test must be met, *see Press–Enterprise II*, 478 U.S. at 14, 106 S.Ct. at 2743 (comparing test to a less rigorous "reasonable likelihood of substantial prejudice" standard applied under California state law). This does not mean, however, that the production of evidence constituting a direct threat or corroborating an affiant's allegations is a strict condition precedent to a district court's granting of a closure motion. *Cf. Lucas,* 932 F.2d at 1217 (holding that an absence of threats against an undercover detective was relevant but not dispositive in determining whether the detective could testify behind a screen to protect her identity).

Indeed, in some circumstances it might be within a district court's discretion to grant closure without evidence of a direct threat or other evidence corroborating a defendant's subjective fears. The problem of retaliatory acts against those producing adverse testimony is especially acute in the context of criminal organizations, such as the one in which Doe allegedly participated. Hence, a district court in such a case might attribute the lack of a direct threat to the very confidentiality that the defendant or witness seeks to preserve. *See United States v. De Los Santos,* 810 F.2d 1326, 1334 (5th Cir.), *cert. denied,* 484 U.S. 978, 108 S.Ct. 490, 98 L.Ed.2d 488 (1987); *United States v. Scarpelli,* 713 F.Supp. 1144, 1145–46 n. 2 (N.D.Ill.1989) (closing a pretrial suppression hearing to protect the defendant from "*Godfather*-style retribution"). The district judge also might recognize that a direct threat may not always be forthcoming. In any event, the lack of a specific evidentiary configuration need not constrain the district court's discretion.

█ In circumstances where a conclusory or wholly implausible allegation of danger is presented, a district court may be justified in denying a closure motion without making any explicit findings of fact. Moreover, even when the affidavit is not implausible on its face, a district court has broad discretion as to how it determines whether the movant has

shown a substantial probability of danger. A district court might decide the issue solely on the adequacy and credibility of the affidavit; alternatively, it might choose to hold a hearing so as to take contrary evidence from the government or any other party opposing the motion and to assess the credibility of the defendant with the aid of cross-examination. However the district court chooses to proceed, the burden of establishing a substantial probability of danger rests squarely on the shoulders of the movant. *See United States v. Powers,* 622 F.2d 317, 324–25 (8th Cir.), *cert. denied,* 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980).

Here, as noted above, the district court did not, in response to Doe's motion to close the trial, make any explicit factual findings within the framework of *Press–Enterprise II*. (In response to his motion to close pretrial hearings, the district court did not make a factual finding as to the extent of danger Doe faced, but did find that the alternative measures ordered adequately protected him until his informant status was disclosed at trial.) The basis for the district court's denial of appellant's motion to close the trial is not clear from the record. It is not even clear to us that the district court was aware of its discretion to close the trial in order to protect Doe. *See* Pretrial Conference, Tr. at 8 ("I am not aware of any authority that exists given the present posture of this case requiring that the courtroom be closed or that the record be sealed."). Alternatively, the district court might have believed that the alternative measures it instituted in response to Doe's motion to close the pretrial hearing also sufficed to protect Doe and his family from whatever danger they faced during trial and in the event of an acquittal.

█ In any event, we think that Doe's affidavit is, on its face, not so incredible as to be the basis for summary denial of Doe's closure motion. Indeed, if the affidavit were credited by the district court and not rebutted by the government, the district court may deem it substantial enough to justify a determination that Doe faced a "substantial probability" of danger. On the limited record before us, however, we are reluctant to displace the district court as finder of fact by

deciding whether Doe has established a substantial probability of danger. Accordingly, we must remand to the district court for a determination of this factual issue.

If a district court finds that there is a substantial probability of prejudice to a compelling interest of a defendant seeking closure, prior to ordering closure of the trial the court is required to consider reasonable alternatives to closure. *Press–Enterprise II,* 478 U.S. at 14, 106 S.Ct. at 2743. Since, as noted, we are unable definitively to ascertain the district court's views on the substantial probability question, we do not know whether the court thought that it had to address the issue of reasonable alternatives with respect to the trial. We cannot say for sure whether the district court contemplated that the protective measures it ordered in response to appellant's motion to close the pretrial hearing—the order to keep Doe safe and segregated in prison, and the permission to Doe to make one telephone call to his family abroad at government expense to alert them to any potential dangers—would also be sufficient for trial.

Should the district court reach the issue of reasonable alternatives to closure, it may well find that the risks faced by Doe in the trial context would be far greater than the risks corresponding to the pretrial hearing. For example, while the district court's order that Doe be kept safe and segregated while in prison might fully have protected Doe during the pretrial hearings, it would not protect Doe in the event he is acquitted following trial. Thus, if the district court does address reasonable alternatives, it will have an opportunity to consider the full spectrum of risks Doe might face—including possible post-acquittal risks. With those risks in mind, the district court can decide whether measures short of complete closure are adequate or, in balancing the remaining prejudice to Doe against the First Amendment right of access, whether *nothing short of* total closure will suffice.

Because of the sparseness of the record, we remand the case to the district court without relinquishing jurisdiction in order for the district court to make factual findings in light of this opinion. *See United States v.*

*Tarricone,* 996 F.2d 1414, 1420 (2d Cir.1993). The district court should make its findings within ninety days of the issuance of this opinion and order. On remand, the district court has the full panoply of options available to it. It may simply amplify the reasons for its prior orders; it may in its discretion hold an evidentiary hearing on the substantial-probability-of-prejudice or reasonable-alternatives issues; or it may determine that its earlier orders denying closure were unwarranted. Should the district court decide upon the last of these options, this opinion and order shall operate as an automatic vacatur of Doe's conviction and the case shall be remanded for retrial, without prejudice to any future challenge that may be raised to any closure order on retrial or any appeal therefrom. Otherwise, we will decide the merits of this appeal on the basis of the district court's findings of fact.

Accordingly, the case is remanded and the mandate shall issue forthwith subject to the condition that the case will be returned to the panel in ninety days or upon the entry of findings by the district court, a copy of which will be filed with the clerk of this court, whichever occurs first. In the event that the district court orders a new trial the judgment is automatically vacated and the case remanded for all purposes.